
[No. B184034. Second Dist., Div. Five. Oct. 5, 2006.]

COUNTY OF LOS ANGELES et al., Plaintiffs and Appellants, v. CALIFORNIA STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Part IV (G)–(L).

988

COUNSEL

Raymond G. Fortner, Jr., County Counsel, Judith A. Fries, Principal Deputy County Counsel; Burhenn & Gest, Howard Gest and David W. Burhenn for Plaintiffs and Appellants County of Los Angeles and Los Angeles County Flood Control District.

Rutan & Tucker, Richard Montevideo and Peter Howell for Plaintiffs and Appellants Cities of Arcadia et al.

Burke, Williams & Sorensen, Leland C. Dolley, Rufus C. Young and Amy E. Morgan for Plaintiffs and Appellants City of Industry, City of Santa Clarita and City of Torrance.

Richards, Watson & Gershon, Lisa Bond, Matthew E. Cohen, Mitchell E. Abbott and John J. Harris for Plaintiffs and Appellants Cities of Monrovia, Norwalk, Rancho Palos Verdes, Artesia, Beverly Hills, Carson, La Mirada and Westlake Village.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Richard Magasin, Helen G. Arens and Jennifer Faye Novak, Deputy Attorneys General, for Defendants and Respondents California Regional Water Quality Control Board, Los Angeles Region and State Water Resources Control Board.

David Saul Beckman, Anjali I. Jaiswal and Michelle S. Mehta for Defendants and Respondents Natural Resources Defense Council, Santa Monica Baykeeper and Heal the Bay.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Plaintiffs, 33 cities,[1] the County of Los Angeles (the county), the Los Angeles County Flood Control District (the flood control district), the Building Industry Legal Defense Fund, and the Construction Industry Coalition on Water Quality, appeal from a March 24, 2005 judgment in favor of defendants, California Regional Water Quality Control Board, Los Angeles Region (the regional board) and the State Water Resources Control Board (the state board) and interveners, Natural Resources Defense Council, Inc., Santa Monica Baykeeper, and Heal the Bay. Plaintiffs challenge the legality of the regional board's issuance of order No. 01-182 adopting the National Pollutant Discharge Elimination System permit No. CAS004001 (the permit) which is

---

[1] The following cities have appealed: Arcadia, Artesia, Bellflower, Beverly Hills, Carson, Cerritos, Claremont, Commerce, Covina, Diamond Bar, Downey, Gardena, Hawaiian Gardens, Industry, Irwindale, La Mirada, Lawndale, Monrovia, Norwalk, Paramount, Pico Rivera, Rancho Palos Verdes, Rosemead, Santa Clarita, Santa Fe Springs, Signal Hill, South Pasadena, Torrance, Vernon, Walnut, West Covina, Westlake Village, and Whittier.

entitled, "Municipal Storm Water And Urban Runoff Discharges Within The County Of Los Angeles, And The Incorporated Cities Therein, Except The City Of Long Beach." The December 13, 2001 permit was issued to the county, the flood control district, and 84 incorporated cities in Los Angeles County. We affirm the judgment in its entirety.

## II. THE PERMIT

### A. Overview

The permit was issued pursuant to the obligations imposed by the Clean Water Act which will be discussed in greater detail later in this opinion. The Clean Water Act of 1977 (33 U.S.C. § 1251 et seq.) was originally entitled the Federal Water Pollution Control Act. (62 Stats. 1115; 1948 U.S. Code Cong. & Admin. News at pp. 2215–2220.) For purposes of clarity and consistency, the federal applicable water pollution statutes will collectively be referred to as the Clean Water Act. The 72-page permit is divided into six parts. There is an overview and findings followed by a statement of discharge prohibitions; a listing of receiving water limitations; the Storm Water Quality Management Program; an explanation of special provisions; a set of definitions; and a list of what are characterized as standard provisions. The county, the flood control district, and the 84 cities are designated in the permit as the permittees. The findings and permit are as follows.

### B. Findings

The permit found that the county, the flood control district, and the 84 cities discharge and contribute to the release of pollutants from "municipal separate storm sewer systems" (storm drain systems). These discharges were the subject of permits issued by the regional board in 1990 and 1996. The 1996 order served as the National Pollutant Discharge Elimination System permit for the discharge of municipal storm water.

The regional board found that storm drain systems in the county discharged cyanide, indicator bacteria, total dissolved solids, total suspended solids, turbidity, nutrients, total aluminum, dissolved cadmium, copper, lead, total mercury, nickel, zinc, bis(2-ethylhexyl)phthalate, polycyclic aromatic hydrocarbons, diazinon, and chlorpyrifos. According to the regional board, there were certain pollutants present in urban runoff which resulted from sources over which the permittees had no control. Among the runoff sources over which the permittees have no control are polycyclic aromatic hydrocarbons

which are the products of internal combustion engines or copper from brake pad wear. Various reports prepared by the regional board, the Los Angeles County Grand Jury, and academic institutions indicated pollutants are threatening to or actually impairing the beneficial uses of water bodies in the Los Angeles region.

The regional board concluded that urbanization increased the velocity, volume, and duration of water runoff; increased erosion; and adversely affected natural drainages. The regional board found: "The [county] has identified as the seven highest priority industrial and commercial critical source types, (i) wholesale trade (scrap recycling, auto dismantling); (ii) automotive repair/parking; (iii) fabricated metal products; (iv) motor freight; (v) chemical and allied products; (vi) automotive dealers/gas stations; [and] (vii) primary metal products." Also, the regional board concluded, "auto repair facilities" contribute "significant concentrations of heavy metals" to storm waters. Moreover, paved surfaces such as those outside fast food establishments or parking lots "are potential sources of pollutants" in storm water runoff. Further, storm water runoff from retail gas establishments "have concentrations" of heavy metals and hydrocarbons.

The regional board further made findings concerning the background of the permit and its coverage area. The essential components of a Storm Water Management Program are: adequate legal authority; fiscal resources; the actual storm water quality management program itself; and a monitoring program. A storm water quality management program consists of: a public information and participation program; an industrial/commercial facilities program: a development planning program; a development construction program; a public agency activities program; and an illicit connection and illicit discharges elimination program. The permittees filed a report of waste discharge dated January 31, 2001, which contained a proposed storm water quality management program.

### C. Prohibited and Allowable Discharges

In the prohibited discharges portion of the permit, the county and the cities were required to "effectively prohibit non-storm water discharges" into their storm sewer systems. This prohibition contains the following exceptions: where the discharge is covered by a national pollutant discharge elimination permit for non-storm-water emission; natural springs and rising ground water;

flows from riparian habitats or wetlands; stream diversions pursuant to a permit issued by the regional board; "uncontaminated ground water infiltrations" as defined by 40 Code of Federal Regulations part 35.2005(b)(20) (1990); and waters from emergency fire-fighting flows. Another category of permissible discharges were flows incidental to urban activities consisting of: reclaimed and potable landscape irrigation runoff; potable drinking water discharges which comply with the American Water Works Association guidelines for dechlorination and "suspended solids reduction practices"; drains for foundations, footings, and crawl spaces; air conditioning condensate; "dechlorinated/debrominated" swimming pool discharges; dewatering of lakes and decorative fountains; noncommercial car washing by residents or non-profit organizations; and sidewalk rinsing.

The regional board's executive officer was granted authority to add or remove categories of non-storm-water discharges. If one of the foregoing categories was determined to be "a source of pollutants" by the regional board's executive officer, the discharge was to be no longer exempt. The executive officer retained the authority to impose conditions on the city or county to ensure that the discharge was "not a source of pollutants." Also, the executive director was given the authority to impose additional "prohibitions on non-storm water discharges" after considering either of two factors. The first factor the regional board's executive officer could consider is anti-degradation policies. The second factor the regional board's executive officer could consider is the total maximum load an impaired water body can receive and still meet applicable water quality standards and protect beneficial uses. (33 U.S.C. § 1313(d)(1).)

## D. Receiving Water Limitations

Receiving waters are defined thusly, " 'Receiving waters' means all surface water bodies . . . ." Discharges from storm sewer systems that "cause or contribute" to violations of "Water Quality Standards" objectives in receiving waters as specified in state and federal water quality plans were prohibited. Storm or non-storm-water discharges from storm sewer systems which constitute a nuisance were also prohibited. The term nuisance is defined, " 'Nuisance' means anything that meets all of the following requirements: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; (3) occurs during, or as a result of, the treatment or disposal of wastes." In

order to comply with the receiving water limitations, the permittees were required to implement control measures in accordance with the permit. If the Storm Water Quality Management Program did not assure compliance with the receiving water requirements, the permittee was required to immediately notify the regional board; submit a receiving water limitations compliance report that described the best management practices that were currently being used and proposed changes to them; submit an implementation schedule as part of the receiving water limitations compliance report; and, after approval by the regional board, promptly implement the new best management practices. If the permittee makes the foregoing changes, even if there were further receiving water discharges beyond those addressed in the water limitations compliance report, additional changes to the best management practices need not be made unless directed to do so by the regional board.

### E. Storm Water Quality Management Program

The permittees were to implement the Storm Water Quality Management Program which meets the standards of 40 Code of Federal Regulations, part 122.26(d)(2) (2000), and reduce the pollutants in storm waters to the maximum extent possible with the use of best management practices. Further, the permittees were required to revise the Storm Water Quality Management Program to comply with specified total daily maximum load allocations. If a permittee modified the countywide Storm Water Quality Management Program, it was required to implement a local management program. Each permittee was required by November 1, 2002, to adopt a storm water and urban runoff ordinance. By December 2, 2002, each permittee was required to certify that it had the requisite legal authority to comply with the permit through adoption of ordinances or municipal code modifications.

The county was designated as the "Principal Permittee" and was given coordination responsibilities for the Storm Water Quality Management Program. Among other things, the county was to convene watershed management committees which were to meet at least four times per year. Each permittee was entitled to have a voting representative on the committees. The committees were to coordinate and monitor implementation of the Storm Water Quality Management Program. Each permittee was required to designate a technically knowledgeable representative to the appropriate watershed management committee. Each permittee was required to prepare a budget summary of moneys spent on the Storm Water Quality Management Program.

The permit granted each permittee the "necessary legal authority" to prohibit non-storm-water discharges into the storm drain system. That authority extended to prohibiting discharges from: illicit connections of all kinds; wash waters from gas stations and automotive service facilities; runoff from mobile cleaning businesses; areas where oil, fluid, or antifreeze was dripping from machinery; storage areas containing hazardous substances; swimming pool waters; washing of toxic materials; and washing impervious surfaces in industrial and commercial areas. The authority also extended to the discharge of concrete and cement-laden wash waters and prohibition of dumping of materials into storm drain systems. The legal authority extended to: requiring persons to comply with permittees' ordinances; holding dischargers to storm drain systems accountable; controlling pollutants and their potential contributors; inspecting, watching, and monitoring procedures to ensure compliance with the permit including prohibition of illicit discharges into storm drain systems; and requiring the use of best management practices to reduce pollutant discharge into the storm drain systems to the maximum extent possible.

## F. Special Provisions

The regional board's executive officer had the power to alter a best management practice under specified circumstances. The county, as the principal permittee, was required to implement a public information and participation program. The program included: marking all storm drains with " 'no dumping' " signs; instituting a countywide hotline to report illicit discharges and other environmental hazards; public education; every year, requiring 50 percent of all school children to be educated on storm water pollution; assessments of education; and other outreach programs.

Each permittee was required to maintain a database of entities that are "critical sources" of storm water pollution. Each permittee was required to inspect under specified circumstances critical facilities including: restaurants; automotive service businesses; retail gasoline outlets; and automotive dealerships. Further, each permittee was to evaluate best management practices and increase their severity if appropriate. Violations of the Storm Water Quality Management Program were to be investigated within specified time periods. By August 1, 2002, the permittees were to amend their ordinances or municipal codes to implement the standard urban storm water mitigation plans contained in the permit. Special requirements were imposed when discharges occur in environmentally sensitive areas.

Each permittee was required to consider storm water quality impacts as part of their California Environmental Quality Act assessments. Each permittee was required to update its general plan to include "considerations and policies" of watershed and storm water quality and quantity management. The permittees were required to educate employees involved in development planning regarding the permit's requirements.

## G. Development Construction Program

The permittees were required to implement programs to "control" runoff from construction sites. Runoff from construction sites was prohibited. Non-storm-water runoff from equipment washing on construction sites was to be contained on site. Special requirements were imposed on construction sites of one acre or greater in area. Additional requirements were imposed on developments which were five acres or larger including securing a general construction activity storm water permit. The permit imposed "Numerical Design Criteria" which required that postconstruction best-management practices incorporate "either a volumetric or flow based treatment control design standard, or both" under specified circumstances. If there is a violation of a general construction activity storm water permit, the permittee may refer the violator to the state board.

## H. Public Agency Activities Program

The permittees were required to minimize storm water pollution impacts. The requirements extended to: sewer systems; public construction; vehicle related facilities; landscape and recreational facilities; storm drain management; and street maintenance. The permittees were also required to participate in a study concerning possible dry weather discharges and the use of alternative treatment control best management practices.

## I. Illicit Discharges and Connections

The permit states, "Permittees shall eliminate all illicit connections and . . . discharges to the storm drain system, and shall document, track, report all such cases . . . ." The elimination and reporting of such discharges required: development of an implementation program; by February 3, 2003, the municipalities provide the county with a list of all approved connections in the storm drain systems; the county to conduct an annual evaluation of illicit

discharges; and training of personnel in the identification and investigation of such discharges. The permittees were to complete the screening of illicit connections as follows: open channels, no later than February 3, 2003; underground pipes by February 1, 2005; and underground pipes with a diameter of 36 inches or greater by December 12, 2006. By December 12, 2006, the permittees were to complete a review of all "permitted connections" to the storm drain systems to ensure eliminating illicit discharges. Upon receipt of a report of an illicit connection, an investigation was to be initiated within 21 days to determine the source and the responsible party. Within 180 days, the permittees were required to "ensure termination of the connection" using appropriate enforcement authority. As to illicit discharges, a permittee was required within one business day to respond to a report and clean up a discharge. Illicit discharges were to be investigated as soon as possible and appropriate enforcement action was to be pursued.

## III. NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM PERMITS, PROCEDURAL HISTORY, AND STANDARDS OF REVIEW

■ The present appeal arises from the issuance of the permit. The legal genesis of the National Pollutant Discharge Elimination System permits for the discharge of municipal storm water has previously been described in some detail in other decisions. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619–621 [26 Cal.Rptr.3d 304, 108 P.3d 862]; *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1380–1381 [38 Cal.Rptr.3d 450].) In *City of Rancho Cucamonga*, our colleagues in Division Two of the Fourth Appellate District summarized the complex federal and state relationship: " 'Part of the Federal Clean Water Act [33 U.S.C. § 1251 et seq.] is the National Pollutant Discharge Elimination System (NPDES), "[t]he primary means" for enforcing effluent limitations and standards under the Clean Water Act. (*Arkansas v. Oklahoma* (1992) 503 U.S. 91, 101 [117 L.Ed.2d 239, 112 S.Ct. 1046].) The NPDES sets out the conditions under which the federal [Environmental Protection Agency] or a state with an approved water quality control program can issue permits for the discharge of pollutants in wastewater. (33 U.S.C. § 1342(a) & (b).) In California, wastewater discharge requirements established by the regional boards are the equivalent of the NPDES permits required by federal law. (§ 13374.)' (*Burbank, supra*, 35 Cal.4th at p. 621.) [¶] California's Porter-Cologne Act (Wat. Code, § 13000 et seq.) establishes a statewide program for water quality control. Nine regional boards, overseen by the State Board, administer the program in their respective regions. (Wat.

Code, §§ 13140, 13200 et seq., 13240, and 13301.) Water Code sections 13374 and 13377 authorize the Regional Board to issue federal NPDES permits for five-year periods. (33 U.S.C. § 1342[](b)(1)(B).)" (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, *supra*, 135 Cal.App.4th at pp. 1380–1381.)

After the board issued the aforementioned December 13, 2001 permit, on January 17, 2003, a series of legal challenges, consisting of the filing administrative mandate and mandate petitions and complaints, were instituted by plaintiffs. Judgments in favor of the regional and state boards were entered on March 24, 2005. After the judgments were entered, notices of appeal were filed on June 21 and 22, 2005. The parties stipulated to the maximum extensions of time to brief the matter as allowed by California Rules of Court, rule 15(b)(1). This court had no authority to deny the stipulated extensions of time to file briefs. (Cal. Rules of Court, rule 15(b) ["The reviewing court may not shorten a stipulated extension"].) No extension of time request was ever granted by any member of this court. The final reply brief was filed on August 1, 2006. Oral argument was held on September 6, 2006.

There are varying standards of review. Many of the challenges to the content of the permit involve review of the denial of Code of Civil Procedure section 1094.5 administrative mandate petitions filed pursuant to Water Code section 13330, subdivision (b). We review the trial court's factual findings for substantial evidence. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693]; *Drummey v. State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 86 [87 P.2d 848].) Further, it is presumed the regional board considered the documents before it. (*City of Santa Cruz v. Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 393–394 [142 Cal.Rptr. 873].) All reasonable doubts are resolved in favor of upholding the regional board's decision. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278]; *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 674 [125 Cal.Rptr.2d 745].) We (and trial courts) examine the regional board's interpretation of legal matters utilizing a de novo standard of review. But we defer to the regional board's expertise in construing language which is not clearly defined in statutes involving pollutant discharge into storm drain sewer systems. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, *supra*, 135 Cal.App.4th at p. 1384.) Finally, the trial court's denials of plaintiffs' new trial and to enter a new judgment motions

and declaratory relief requests are reviewed for an abuse of discretion. (*Ashcraft v. King* (1991) 228 Cal.App.3d 604, 616 [278 Cal.Rptr. 900] [new trial motion]; *Bess v. Park* (1955) 132 Cal.App.2d 49, 52 [281 P.2d 556] [declaratory relief].)

## IV. DISCUSSION

### A. The Jurisdiction of the Regional Board to Issue the Permit

Plaintiffs contend the regional board did not have jurisdiction to issue the permit. Plaintiffs rely on language appearing in the Code of Federal Regulations. For example, the permittees cite to 40 Code of Federal Regulations part 123.1(g)(1) (1998) which states, "NPDES authority may be shared by two or more State agencies but each agency must have Statewide jurisdiction over a class of activities or discharges."[2] Further the permittees refer to the following language in 40 Code of Federal Regulations part 123.22(b) (1998), "If more than one agency is responsible for administration of a program, each agency must have statewide jurisdiction over a class of activities."[3] Moreover, 40 Code of Federal Regulations part 123.1(f) (1998) states, "Any State

[2] 40 Code of Federal Regulations part 123.1(g)(1) (1998) states in its entirety: "(g)(1) Except as may be authorized pursuant to paragraph (g)(2) of this section or excluded by § 122.3, the State program must prohibit all point source discharges of pollutants, all discharges into aquaculture projects, and all disposal of sewage sludge which results in any pollutant from such sludge entering into any waters of the United States within the State's jurisdiction except as authorized by a permit in effect under the State program or under section 402 of [the Clean Water Act]. [National Pollutant Discharge Elimination System] authority may be shared by two or more State agencies but each agency must have Statewide jurisdiction over a class of activities or discharges. When more than one agency is responsible for issuing permits, each agency must make a submission meeting the requirements of § 123.21 before [the Environmental Protection Agency] will begin formal review. [¶] (2) A State may seek approval of a partial or phased program in accordance with section 402(n) of the [Clean Water Act]."

[3] 40 Code of Federal Regulations part 123.22(b) (1998) states in its entirety: "A description (including organization charts) of the organization and structure of the State agency or agencies which will have responsibility for administering the program, including the information listed below. If more than one agency is responsible for administration of a program, each agency must have statewide jurisdiction over a class of activities. The responsibilities of each agency must be delineated, their procedures for coordination set forth, and an agency may be designated as a 'lead agency' to facilitate communications between [the Environmental Protection Agency] and the State agencies having program responsibility. If the State proposes to administer a program of greater scope of coverage than is required by Federal law, the information provided under this paragraph shall indicate the resources dedicated to administering the Federally required portion of the program. [¶] (1) A description of the State agency staff who will carry out the State program, including the number, occupations, and general duties of the employees. The State need not submit complete job descriptions for every employee carrying out the State program. [¶] (2) An itemization of the estimated costs of establishing and administering the program for the first two years after approval, including cost

program approved by the Administrator shall at all times be conducted in accordance with the requirements of this part."

■ Plaintiffs reason that under state law, the regional board does not have statewide jurisdiction. Water Code section 13100 states that the state and regional boards are part of the California Environmental Protection Agency. Water Code section 13200 identifies the scope of jurisdiction of the nine regional boards. The regional board's limited jurisdiction is defined in Water Code section 13200, subdivision (d).[4] The powers of the regional boards are set forth in Water Code section 13225 with the caveat that the powers exist "with respect to its region."[5] Because the regional board is not a statewide agency, plaintiffs argue the permit is void.

■ This argument has no merit. Effective September 22, 1989, the authority to issue National Pollutant Discharge Elimination System permits was vested by the federal Environmental Protection Agency in the state board. (54 Fed.Reg. 40664, 40665 (Oct. 3, 1989); see *Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124

of the personnel listed in paragraph (b)(1) of this section, cost of administrative support, and cost of technical support. [¶] (3) An itemization of the sources and amounts of funding, including an estimate of Federal grant money, available to the State Director for the first two years after approval to meet the costs listed in paragraph (b)(2) of this section, identifying any restrictions or limitations upon this funding."

[4] Water Code section 13200, subdivision (d) states: "The state is divided, for the purpose of this division, into nine regions: [¶] Los Angeles region, which comprises all basins draining into the Pacific Ocean between the southeasterly boundary, located in the westerly part of Ventura County, of the watershed of Rincon Creek and a line which coincides with the southeasterly boundary of Los Angeles County from the ocean to San Antonio Peak and follows thence the divide between San Gabriel River and Lytle Creek drainages to the divide between Sheep Creek and San Gabriel River drainages."

[5] Water Code section 13225 states in its entirety: "Each regional board, with respect to its region, shall: [¶] (a) Obtain coordinated action in water quality control, including the prevention and abatement of water pollution and nuisance. [¶] (b) Encourage and assist in self-policing waste disposal programs, and upon application of any person, advise the applicant of the condition to be maintained in any disposal area or receiving waters into which the waste is being discharged. [¶] (c) Require as necessary any state or local agency to investigate and report on any technical factors involved in water quality control or to obtain and submit analyses of water; provided that the burden, including costs, of such reports shall bear a reasonable relationship to the need for the report and the benefits to be obtained therefrom. [¶] (d) Request enforcement by appropriate federal, state and local agencies of their respective water quality control laws. [¶] (e) Recommend to the state board projects which the regional board considers eligible for any financial assistance which may be available through the state board. [¶] (f) Report to the state board and appropriate local health officer any case of suspected contamination in its region. [¶] (g) File with the state board, at its request, copies of the record of any official action. [¶] (h) Take into consideration the effect of its actions pursuant to this chapter on the California Water Plan adopted or revised pursuant to Division 6 (commencing with Section 10000) of this code and on any other general or coordinated governmental plan looking toward the development, utilization or conservation of the water resources of the state. [¶] (i) Encourage regional planning and action for water quality control."

Cal.App.4th 866, 875 [22 Cal.Rptr.3d 128].) The state board is organized into nine regional boards which are part of the California Environmental Protection Agency. (Wat. Code, §§ 174 et seq., 13100; see *City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1405 [38 Cal.Rptr.3d 373].) The nine regional boards are authorized under this state's laws to issue National Pollutant Discharge Elimination System permits. (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd., supra,* 124 Cal.App.4th at p. 875; Wat. Code, § 13374.) The United States Environmental Protection Agency memorandum of agreement with the state board complies with the statewide jurisdiction requirements imposed by the federal regulations. The fact the state board is organized into nine regional boards is legally irrelevant. The state board has statewide jurisdiction.

■ Further, we agree with the Attorney General that plaintiffs may not challenge the regional board's authority to issue a National Pollutant Discharge Elimination System permit in this proceeding. Such an indirect challenge to the board's authority is barred by the de facto officer doctrine. The Supreme Court has described the de facto officer doctrine, which bars a challenge to an agency's action based on a purported lack of legal authority to act, thusly: "[W]e conclude that under the 'de facto officer' doctrine prior actions of the Commission cannot be set aside on the ground that the appointment of the commissioners who participated in the decision may be vulnerable to constitutional challenge. As this court explained in *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 41–42 [37 Cal.Rptr. 74, 389 P.2d 538]: 'The de facto doctrine in sustaining official acts is well established. [Given the existence of] a de jure office, "[p]ersons claiming to be public officers while in possession of an office, ostensibly exercising their function lawfully and with the acquiescence of the public, are *de facto* officers. . . . The lawful acts of an officer *de facto*, so far as the rights of third persons are concerned, are, if done within the scope and by the apparent authority of office, as valid and binding as if he were the officer legally elected and qualified for the office and in full possession of it." [Citations.]' (See also *Pickens v. Johnson* (1954) 42 Cal.2d 399, 410 [267 P.2d 801] ['There is no question but that . . . the status of a judge de facto attached to his action. The office to which he was assigned was a de jure office. By acting under regular assignment under a statute authorizing it he was acting under color of authority as provided by law. His conduct in trying the cases and rendering judgment therein cannot here be questioned.'].)" (*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 54 [30 Cal.Rptr.3d 30, 113 P.3d 1062].) Here, plaintiffs are challenging the permit by attacking the regional board's authority. Under these circumstances, this they may not do in what amounts to a licensing proceeding. (*Ibid.*; *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d at pp. 41–42.)

■ Finally there is no merit to the contention that because the regional board is not an elected body, it cannot make the financial decisions of the scope entailed by the permit. The board's powers exist because of: the Clean Water Act which was adopted and amended by elected members of Congress and signed into law by elected presidents; provisions of the Water Code which were enacted by elected legislators and approved by elected governors; and the members, who must have special competence, are appointed by an elected governor and confirmed by the elected State Senate. (Wat. Code, § 13201, subds. (a), (b).) The democratic processes of government control every aspect of the creation of the board, its legal authority, and the selection of its members. Further, the decisions of regulatory institutions such as the regional board, are entitled by law to a presumption of competence and propriety. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, *supra*, 135 Cal.App.4th at p. 1384; *Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1104 [1 Cal.Rptr.3d 76].)

## B. The Motions to Strike

■ Plaintiffs argue that the trial court erroneously granted the regional board's motions to strike portions of the petition. Plaintiffs contend: the motions to strike were in fact disguised summary adjudication motions; the orders granting the motions to strike did not resolve entire causes of action; and hence, the orders violated Code of Civil Procedure section 437c, subdivision (f)(1). This contention has no merit. Code of Civil Procedure section 436 allows a court to strike portions of a cause of action. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, *supra*, 135 Cal.App.4th at p. 1386; *PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680, 1682–1683 [40 Cal.Rptr.2d 169].)

## C. The State Board's Demurrer

■ Plaintiffs argue that the trial court erroneously sustained the state board's demurrer to the petitions. The state board contended it was not properly joined as a party to the litigation. A group of plaintiffs alleged the state board required the regional boards to adopt terms and conditions on National Pollutant Discharge Elimination System permits without complying with Government Code sections 11340.5, subdivision (a)[6] and 11352,

---

[6] Government Code section 11340.5, subdivision (a) states, "No state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in Section 11342.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter."

subdivision (b), which are part of the Administrative Procedure Act. Plaintiffs had a duty to specifically allege every fact that would give rise to liability by the state board. (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 790 [11 Cal.Rptr.3d 222, 86 P.3d 290]; *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 795 [221 Cal.Rptr. 840, 710 P.2d 907].) The state board refused to assume jurisdiction over this case. There were thus no specific allegations as to the state board to hold it liable as it engaged in no independent activity. Hence, this contention has no merit and the demurrer was properly sustained. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd., supra*, 135 Cal.App.4th at p. 1383; *People ex rel Cal. Regional Wat. Quality Control Bd. v. Barry* (1987) 194 Cal.App.3d 158, 177 [239 Cal.Rptr. 349].)

### D. The Declaratory Relief Claims

The trial court sustained the regional board's demurrers to the declaratory relief claims. Plaintiffs argue they were entitled to declaratory relief as to whether the permittees were required to "go beyond the [maximum extent practicable]" standard to comply with part 2 of the permit which relates to receiving water limitations; part 2 contained a "safe harbor" if the permittees were acting in good faith in implementing best management practices to control excessive discharge of pollutants and nuisance conditions; the requirement in part 4 of the permit that each permittee's general plan and California Environmental Quality Act review take into account storm water runoff is lawful; the regional board was required to consider the economic impact of the proposed permit and its effect on housing; and the regional board was required to perform a "cost/benefit analysis" of the monitoring and reporting program.

■ When a remedy has been designated by the Legislature to review an administrative action, declaratory relief is unavailable. (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 249 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Scott v. City of Indian Wells* (1972) 6 Cal.3d 541, 546 [99 Cal.Rptr. 745, 492 P.2d 1137].) ■ Water Code section 13330, subdivision (b) provides that a regional board order may be reviewed by a Code of Civil Procedure section 1094.5 administrative mandate petition filed within 30 days after the state board denies review. Therefore, the demurrer was correctly sustained to the declaratory relief claims. (*Hill v. City of Manhattan Beach* (1971) 6 Cal.3d 279, 287 [98 Cal.Rptr. 785, 491 P.2d 369]; *Hostetter v. Alderson* (1952) 38 Cal.2d 499, 500 [241 P.2d 230].)

### E. The Regional Board Has Not Unlawfully Interfered in Local General Plans and California Environmental Quality Act Reviews

The permit requires the permittees to update their general plans to include watershed and storm water runoff as considerations in land use, housing, conservation, and open space planning. Further, the permittees were required to amend their California Environmental Quality Act process to ensure review of the effect of commercial and residential development on storm water runoff. Plaintiffs argue these aspects of the permit violate the separation of powers doctrine. This contention has no merit. As noted, the regional boards are part of a joint state and federal process to enforce the Clean Water Act. (*City of Burbank v. State Water Resources Control Bd.*, *supra*, 35 Cal.4th at pp. 619–620; *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, *supra*, 135 Cal.App.4th at pp. 1380–1381.) The general plan powers and duties of cities and counties are limited by statewide law. (Cal. Const., art. XI, § 7; Gov. Code, § 65030.1; *Jackson v. City of Los Angeles* (2003) 111 Cal.App.4th 899, 907–908 [4 Cal.Rptr.3d 325]; *Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1118 [67 Cal.Rptr.2d 420].) Further, the Clean Water Act supersedes all conflicting state and local pollution laws. (*Arkansas v. Oklahoma* (1992) 503 U.S. 91, 101 [117 L.Ed.2d 239, 112 S.Ct. 1046]; *City of Burbank v. State Water Resources Control Bd.*, *supra*, 35 Cal.4th at p. 621.) The state and regional boards are vested with the primary responsibility of controlling water quality. (Wat. Code, § 13001; see *Arkansas v. Oklahoma, supra*, 503 U.S. at p. 101; *Hampson v. Superior Court* (1977) 67 Cal.App.3d 472, 484 [136 Cal.Rptr. 722].) Regional boards are explicitly granted the authority to issue orders for purposes of enforcing the federal Clean Water Act. (Wat. Code, § 13377.) Federal law requires that permits include controls to reduce pollutant discharge in areas of new development and significant redevelopment—the very area where regional board review occurs. (40 C.F.R. § 122.26(d)(2)(iv)(A)(2) (2006).) So long as the regional boards' decisions carry out federal and state water quality mandates resulting from express legislative action as the challenged orders in this case in fact do, no separation of powers issue is present. (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 375–377 [71 Cal.Rptr. 687, 445 P.2d 303]; *Salmon Trollers Marketing Assn. v. Fullerton* (1981) 124 Cal.App.3d 291, 300 [177 Cal.Rptr. 362].) Given the foregoing, we need not address the waiver, laches, and estoppel contentions of the regional and state boards and the interveners.

### F. Failure to Comply with the California Environmental Quality Act

Plaintiffs argue that the permit issuance process violates provisions of the California Environmental Quality Act. Plaintiffs rely on Water Code section

13389 which provides that chapter 3 of the California Environmental Quality Act does not apply to National Pollutant Discharge Elimination Systems permit proceedings: "Neither the state board nor the regional boards shall be required to comply with the provisions of Chapter 3 (commencing with Section 21100) of Division 13 of the Public Resources Code prior to the adoption of any waste discharge requirement, except requirements for new sources as defined in the Federal Water Pollution Control Act or acts amendatory thereof or supplementary thereto." California Code of Regulations, title 23, section 3733 also states, "Environmental documents are not required for adoption of waste discharge requirements under Chapter 5.5, Division 7 of the Water Code, except requirements for new sources as defined in the Federal Water Pollution Control Act. This exemption is in accordance with Water Code Section 13389 which does not apply to the policy provisions of Chapter 1 of CEQA." Plaintiffs argue that the California Environmental Quality Act applies to: the receiving water limitations; the revision of the Storm Water Quality Management Program; and the development planning program. (See *City of Arcadia v. State Water Resources Control Bd., supra,* 135 Cal.App.4th at pp. 1420–1426; *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 862 [237 Cal.Rptr. 723].)

Chapter 3 of the California Environmental Quality Act was originally adopted in 1970. (Stats. 1970, ch. 1433, § 1, pp. 2780, 2781–2782.) The original chapter 3 of the California Environmental Quality Act required all state agencies, boards, and commissions that proposed a project which would have a significant effect on the environment to prepare a "detailed statement" setting forth the environmental effect of the contemplated undertaking.[7] (See *Russian Hill Improvement Assn. v. Board of Permit Appeals* (1974) 44 Cal.App.3d 158, 166 [118 Cal.Rptr. 490]; *City of Orange v. Valenti* (1974) 37 Cal.App.3d 240, 246 [112 Cal.Rptr. 379].) Water Code section 13389 was adopted as urgency legislation to comply with certain provisions of the Clean Water Act provisions establishing the National Pollution Discharge Elimination System. (Stats. 1972, ch. 1256, § 3, p. 2490.) Expressly for that purpose, the California Legislature enacted chapter 5.5, the "Water Quality" division,

---

[7] Public Resources Code section 21100 as enacted in 1970 stated: "All state agencies, boards, and commissions shall include in any report on any project they propose to carry out which could have a significant effect on the environment of the state, a detailed statement by the responsible state official setting forth the following: [¶] (a) The environmental impact of the proposed action. [¶] (b) Any adverse environmental effects which cannot be avoided if the proposal is implemented. [¶] (c) Mitigation measures proposed to minimize the impact. [¶] (d) Alternatives to the proposed action. [¶] (e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity. [¶] (f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented." (Stats. 1970, ch. 1433, § 1, pp. 2780, 2781–2782.)

which includes Water Code section 13389. (Wat. Code, § 13370[8]; *City of Brentwood v. Central Valley Regional Water Quality Control Bd.* (2004) 123 Cal.App.4th 714, 723 [20 Cal.Rptr.3d 322]; *Sierra Club v. Union Oil Co. of California* (9th Cir. 1987) 813 F.2d 1480, 1483.) When Water Code section 13389 became effective on December 19, 1972, chapter 2.6 of the California Environmental Quality Act had just been enacted, also as urgency legislation, and it consisted of Public Resources Code sections 21080 through 21090. The new chapter 2.6 of the California Environmental Quality Act became effective on December 5, 1972. (Stats. 1972, ch. 1154, § 19, p. 2280.) Chapter 3 of the California Environmental Quality Act was also amended effective December 5, 1972, and it applied to all environmental assessments by state agencies, boards, and commissions. Former Public Resources Code section 21100, the core provision of the 1972 version of the California Environmental Quality Act as it related to state agencies, boards, and commissions, stated: "All state agencies, boards, and commissions shall prepare, or cause to be prepared . . . and certify the completion of an environmental impact report on any project they propose to carry out or approve which may have a significant effect on the environment." (Stats. 1972, ch. 1154, § 2.5, p. 2274; see *Desert Environment Conservation Assn. v. Public Utilities Com.* (1973) 8 Cal.3d 739, 742 [106 Cal.Rptr. 31, 505 P.2d 223]; *San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594, fn. 8 [122 Cal.Rptr. 100].) Beyond question, the Legislature intended that chapter 3 of the California Environmental Quality Act not apply to National Pollution Discharge Elimination System permits—in that respect Water Code section 13389 is entirely clear.

But on December 19, 1972, when Water Code section 13389 was enacted, chapter 2.6 of the California Environmental Quality Act, which contains generalized requirements for the preparation of environmental impact reports for discretionary projects, had just been adopted effective December 5, 1972. Chapter 2.6 of the California

---

[8] Water Code section 13370 states: "(a) The Federal Water Pollution Control Act (33 U.S.C. Sec. 1251 et seq.), as amended, provides for permit systems to regulate the discharge of pollutants and dredged or fill material to the navigable waters of the United States and to regulate the use and disposal of sewage sludge. [¶] (b) The Federal Water Pollution Control Act, as amended, provides that permits may be issued by states which are authorized to implement the provisions of that act. [¶] (c) It is in the interest of the people of the state, in order to avoid direct regulation by the federal government of persons already subject to regulation under state law pursuant to this division, to enact this chapter in order to authorize the state to implement the provisions of the Federal Water Pollution Control Act and acts amendatory thereof or supplementary thereto, and federal regulations and guidelines issued pursuant thereto, provided, that the state board shall request federal funding under the Federal Water Pollution Control Act for the purpose of carrying out its responsibilities under this program."

Environmental Quality Act applies to discretionary projects proposed by public agencies. (Former Pub. Resources Code, § 21080.) Pursuant to new chapter 2.6 of the California Environmental Quality Act, all public agencies were required to adopt by ordinance, resolution, or the like procedures for preparation of environmental impact reports. (Former Pub. Resources Code, § 21082.) The Office of Planning and Research was directed to adopt proposed guidelines for the preparation of environmental impact reports including a listing of projects determined not to have a significant impact on the environment. (Former Pub. Resources Code, §§ 21083–21088.) Finally, chapter 2.6, as adopted in 1972, allowed a public agency to charge fees for the preparation of an environmental impact report and defined public and private developments pursuant to a redevelopment plan as a single project. (Former Pub. Resources Code, §§ 21089–21090.)

It can be argued that even though chapter 3 with its environmental impact preparation requirement for state agencies, boards, and commissions was not to apply to National Pollution Discharge Elimination System permits, the discretionary projects requirements in chapter 2.6 of the California Environmental Quality Act mandated environmental review. Hence, the argument would be that the Legislature in enacting Water Code section 13389 did not intend to obviate the duty pursuant to chapter 2.6 of the California Environmental Quality Act to prepare an environmental impact report. We are unpersuaded by this analysis. Former Public Resources Code section 20180, subdivision (a), the core provision relating to discretionary projects, stated: "(a) Except as otherwise provided in this division, this division shall apply to discretionary projects proposed to be carried out or approved by public agencies including, but not limited to, the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps (except where such a project is exempt from the preparation of an environmental impact report pursuant to Section 21166)." (Stats. 1972, ch. 1154, § 2.3, p. 2272; see *People v. County of Kern* (1974) 39 Cal.App.3d 830, 839 [115 Cal.Rptr. 67]; *Friends of Lake Arrowhead v. Board of Supervisors* (1974) 38 Cal.App.3d 497, 510 [113 Cal.Rptr. 539].) As can be noted, Public Resources Code section 21080, subdivision (a) established that a discretionary project was subject to the environmental impact requirement. But the requirement that a state agency, board, and commission prepare an environmental report was found in Public Resources Code section 21100 which was, and is now, located in chapter 3 of the California Environmental Quality Act. The obligation imposed on a state agency, board, and commission to prepare an environmental impact report existed in chapter 3 before the adoption of Water Code section 13389 and it remained there after the 1972 amendments to the California Environmental Quality Act. No doubt, since 1972 when the Legislature adopted Water Code section 13389 and the then new chapter 2.6,

the California Environmental Quality Act has been repeatedly amended. But defendants cite no evidence the Legislature ever intended to: impose a duty on regional boards to prepare environmental impact reports; require regional boards to engage in any other form of environmental review specified in the California Environmental Quality Act; or to otherwise modify Water Code section 13389.

 Defendants rely on the analysis of our colleague Presiding Justice Judith D. McConnell of Division One of the Fourth Appellate District in *City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th at pages 1420–1430, that regional board basin plans are subject to limited California Environmental Quality Act review. The *City of Arcadia* decision does not involve the issuance of a National Pollution Discharge Elimination System permit. Rather, it involves the development of a basin plan. (*City of Arcadia v. State Water Resources Control Bd., supra*, at pp. 1420–1430.) We agree with the Attorney General that a basin plan is subject to limited environmental review pursuant to Public Resources Code section 21080.5. Public Resources Code section 21080.5, subdivision (a) vests the Secretary of the Resources Agency with the authority to require limited environmental review: "(a) Except as provided in Section 21158.1, when the regulatory program of a state agency requires a plan or other written documentation containing environmental information and complying with paragraph (3) of subdivision (d) to be submitted in support of an activity listed in subdivision (b), the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division if the Secretary of the Resources Agency has certified the regulatory program pursuant to this section." The secretary's authority extends to requiring limited environmental review when an agency adopts "standards, rules, regulations, or plans for use" in a regulatory program. (Pub. Resources Code, § 21080.5, subd. (b)(2).) The secretary has certified the regional boards' basin plan program as requiring limited environmental review. (*City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th at p. 1422; Cal. Code Regs., tit. 14, § 15251, subd. (g).[9]) The resources secretary has never identified the National Pollution Discharge Elimination System permit system as a Public Resources Code section 21080.5 certified program. Thus, *City of Arcadia* does not require California Environmental Quality Act review prior to the issuance of a National Pollution Discharge Elimination System permit.

---

[9] California Code of Regulations, title 14, section 15251, subdivision (g) states: "The following programs of state regulatory agencies have been certified by the Secretary for Resources as meeting the requirements of Section 21080.5: [¶] . . . [¶] (g) The Water Quality Control (Basin)/208 Planning Program of the State Water Resources Control Board and the Regional Water Quality Control Boards.

G.–L.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. DISPOSITION

The judgment is affirmed. Defendants, California Regional Water Quality Control Board, Los Angeles Region and the State Water Resources Board, are to recover their costs incurred on appeal jointly and severally from plaintiffs, the cities of Arcadia, Artesia, Bellflower, Beverly Hills, Carson, Cerritos, Claremont, Commerce, Covina, Diamond Bar, Downey, Gardena, Hawaiian Gardens, Industry, Irwindale, La Mirada, Lawndale, Monrovia, Norwalk, Paramount, Pico Rivera, Rancho Palos Verdes, Rosemead, Santa Clarita, Santa Fe Springs, Signal Hill, South Pasadena, Torrance, Vernon, Walnut, West Covina, Westlake Village, and Whittier, and the County of Los Angeles, Los Angeles County Flood Control District, Building Industry Legal Defense Fund, and the Construction Industry Coalition on Water Quality.

Armstrong, J., and Kriegler, J., concurred.

Petitions for a rehearing were denied November 6, 2006, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied February 14, 2007, S148749.

---

*See footnote, *ante*, page 985.