Filed 11/14/13 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STATE DEPARTMENT OF FINANCE et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> COMMISSION ON STATE MANDATES, <br><br> Defendant and Respondent; <br><br> COUNTY OF LOS ANGELES et al., <br><br> Real Parties in Interest and Appellants. | B237153 <br><br> (Los Angeles County <br> Super. Ct. No. BS130730) <br><br> ORDER MODIFYING OPINION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 16, 2013, be modified as follows:

On page 37, at line six of the first full paragraph, delete the word "unfettered" and replace it with the word "wide."

This modification has no effect on the judgment.

CERTIFIED FOR PUBLICATION.

_____

MALLANO, P. J.                    ROTHSCHILD, J.                    JOHNSON, J.

Filed 10/16/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STATE DEPARTMENT OF FINANCE et al., | B237153 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS130730) |
| v. | |
| COMMISSION ON STATE MANDATES, | |
| Defendant and Respondent; | |
| COUNTY OF LOS ANGELES et al., | |
| Real Parties in Interest and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ann I. Jones, Judge. Affirmed.

Burhenn & Gest, Howard Gest, David W. Burhenn, for Appellants and Real Parties in Interest County of Los Angeles, Cities of Bellflower, Carson, Commerce, Covina, Downey and Signal Hill.

John F. Krattli, County Counsel, and Judith Fries, Principal Deputy Counsel, for Appellant and Real Party in Interest County of Los Angeles.

Somach Simmons & Dunn, Theresa A. Dunham, Nicholas A. Jacobs for California Stormwater Quality Association, Santa Clara Valley Urban Runoff Pollution Prevention Program, Riverside County Flood Control and Water Conservation District and County of

Riverside, the Alameda County Clean Water Program, and City/County Association of Governments of San Mateo County as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Building Industry Legal Defense Foundation, Andrew R. Henderson, as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Peter K. Southworth, Supervising Deputy Attorney General, and Kathleen A. Lynch, Deputy Attorney General, for Plaintiffs and Respondents State of California Department of Finance, State Water Resources Control Board, and California Regional Water Quality Control Board, Los Angeles Region.

No appearance for Defendant and Respondent Commission on State Mandates.

_____

In December 2001, the California Regional Water Quality Control Board, Los Angeles Region (Regional Board) issued a municipal stormwater sewer permit (Permit) to real parties in interest Los Angeles County and designated cities within the county, including the cities of Bellflower, Carson, Commerce, Covina, Downey and Signal Hill (collectively County).  The Permit is governed by a complex state and federal statutory scheme regulating pollutant discharge into waterways under the federal Clean Water Act and the California Porter-Cologne Water Act.  The Permit's subvention status is subject to initial determination by the Commission on State Mandates (Commission).  Real parties in interest filed a test claim before the Commission, seeking to determine whether four requirements of the Permit (to install trash receptacles at transit stops and to conduct inspections of commercial, industrial, and construction sites) constituted unfunded state mandates subject to reimbursement under the California Constitution, article XIII B, section 6 because although the Permit was governed by both federal law and state law, the County asserted the Permit contained additional state requirements not found in the governing federal statutes and regulations.  The Commission agreed and found that the requirements constituted state mandates, although it

2

concluded subvention was required only for the trash receptacles because the County had the ability to levy fees to pay for the inspections.

The Department of Finance filed a petition for writ of mandate in the trial court, seeking to overturn the Commission's ruling, contending that the requirements were solely federal mandates because they implemented the directive of the federal statutes and regulations and thus were not subject to state subvention. The trial court agreed and found that the Commission erred in finding the Permit requirements were state mandates because it did not apply the applicable federal "maximum extent practicable" standard, and issued a writ of mandate ordering the Commission to vacate its decision.

On appeal, the dispute centers on whether the federal standard requiring the reduction of pollutants to the maximum extent practicable encompassed the specific four requirements of the Permit, given that the federal regulations at issue did not expressly spell out such requirements. The amici parties California Stormwater Quality Association et al. (collectively CSQA) join in the County's arguments that the trial court erred in finding the maximum extent practicable standard controlled. The amicus party Building Association Legal Defense Foundation (Building Association) asserts that the issue is one of preemption, and the trial court erred in finding that the federal regulations governed the court's mandate analysis. We agree with the trial court's conclusion that the Commission failed to apply the controlling maximum extent practicable standard, that the Permit's mandates implement the maximum extent practicable objective, and thus are federal mandates. We affirm the judgment.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

A.    **Regulatory Structure**

The Permit was issued as a "National Pollutant Discharge Elimination System" (NPDES) permit pursuant to the Clean Water Act, Title 33 United States Code section 1342. The Clean Water Act requires operators of municipal separate storm sewer systems to obtain NPDES permits that contain controls to "reduce the discharge of pollutants to the maximum extent practicable." (33 U.S.C. § 1342(p)(3)(B)(iii).) The Commission did not consider this standard in evaluating the Permit's requirements, instead looking solely to whether the

3

requirements were expressly set forth in the implementing federal regulation at 40 Code of Federal Regulations, part 122.26(d)(2)(iv)(A)–(D) (a copy of appendix A is attached).

       *1.      Federal Framework*

In 1972, Congress passed the Clean Water Act. (33 U.S.C. § 1251 et seq.) The Clean Water Act's national goal was to eliminate discharge of pollutants into navigable waters of the United States by 1985. (*PUD No. 1 of Jefferson County v. Washington Dept. of Ecology* (1994) 511 U.S. 700, 704 [114 S.Ct. 1900, 128 L.Ed.2d 716]; *City of Burbank v. State Water Resources Control Board* (2005) 35 Cal.4th 613, 619–620 (*City of Burbank*).) To achieve this goal, the Clean Water Act "established restrictions on the 'quantities, rates, and concentrations of chemical, physical, biological, and other constituents'" that could be discharged into the nation's waterways. "[T]hese effluent limitations permit the discharge of pollutants only when the water has been satisfactorily treated to conform to federal water quality standards. (33 U.S.C. §§ 1311 1362(11).)" (*City of Burbank*, at p. 620.)

"The Clean Water Act employs the basic strategy of prohibiting emissions from 'point sources,'[1] unless the [emitter] obtains . . . an NPDES permit." (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 872, fns. omitted (*Building Industry*).) NPDES permits are required for "a discharge from a municipal separate storm sewer system serving a population of 250,000 or more." (33 U.S.C. § 1342(p)(2)(C).) NPDES permits have "'five components: technology-based limitations, water-quality based limitations, monitoring and reporting requirements, standard conditions, and special conditions.'" (*WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452.)

Special rules apply to storm sewers. In 1987, Congress amended the Clean Water Act to require operators of "municipal separate storm sewer systems" (MS4)[2] to control or reduce

---

    **1** A "point source" is "any discernable, confined and discrete conveyance" and includes "any pipe, ditch, channel . . . from which pollutants . . . may be discharged." (33 U.S.C. § 1362(14).)

    **2** MS4's fall under the definition of "point source." (33 U.S.C. § 1362(14).)

the discharge of pollutants to the "maximum extent practicable" (MEP).**[3]**  (33 U.S.C. § 1342(p)(3)(B)(iii).)  Congress "clarified that the EPA [Environmental Protection Agency (EPA)] had the authority to fashion NPDES permit requirements to meet water quality standards without specific numerical effluent limits and instead to impose 'controls to reduce the discharge of pollutants to the maximum extent practicable . . . .'"  (*Building Industry*, *supra*, 124 Cal.App.4th at p. 874; 33 U.S.C. § 1342(p)(3)(B)(iii).)  Stormwater discharge is a significant source of water pollution, and contains suspended metals, sediments, algae-promoting nutrients, trash, used motor oil, raw sewage, pesticides, and other toxic contaminants.  Sources of polluted stormwater discharge are "urban development, industrial facilities, construction sites, and illicit discharges and connections to storm sewer systems." (*Environmental Defense Center, Inc. v. U.S.E.P.A.* (9th Cir. 2003) 344 F.3d 832, 840.)  Unlike a sanitary sewer system, which transports sewage for treatment at a wastewater facility, MS4's convey only stormwater.  (*Natural Resources Defense Council, Inc. v. County of Los Angeles* (2013) 725 F.3d 1194, 1197, fn. 2.)  As a result, the flexible maximum extent practicable standard is designed to permit MS4 dischargers to comply with such requirement on a permit-by-permit basis.

The EPA promulgated regulations to provide guidance to stormwater system permittees concerning requirements for MS4 permits.  The regulations contain certain requirements, such as requiring MS4 permittees to include a program to monitor discharge from municipal landfills, hazardous waste treatment plants, but otherwise allow permittees to develop their own programs to meet the maximum extent practicable standard.  (See 40

---

**[3]** Title 33 United States Code section 1342(p)(3)(B)(iii) requires operators of municipal storm sewer systems permits to "require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants."  The Clean Water Act does not define the "maximum extent practicable" standard.  (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1427, fn. 13.) Indeed, the EPA has expressly declined to directly define the standard.  (40 C.F.R. § 122.2; 64 Fed.Reg. 68722, 68754 (Dec. 8, 1999).)

C.F.R. § 122.26(d)(2)(iv)(A)–(C).) Before an NPDES permit is issued, the federal or state regulatory agency must follow an extensive administrative hearing procedure. (See, e.g., 40 C.F.R. §§ 124.3, 124.6, 124.8, 124.10.)

### 2. *State Framework*

With respect to concurrent state regulation, "[t]he Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' [Citation.]" (*Arkansas v. Oklahoma* (1992) 503 U.S. 91, 101 [112 S.Ct. 1046, 117 L.Ed.2d 239].) The Clean Water Act permits states to adopt more stringent standards than those under the Clean Water Act itself. (33 U.S.C. § 1370.) "Nothing in this part precludes a State from: (1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this part; (2) Operating a program with a greater scope of coverage than that required under this part." (40 C.F.R. § 123.l(i).)

Under California law, the Porter-Cologne Water Quality Control Act (Porter-Cologne Act), enacted in 1969, predates the Clean Water Act and establishes a statewide program for water quality control. (Wat. Code, § 13000 et seq.) Nine regional boards, overseen by the State Water Resources Control Board (State Board), administer the state program in their respective regions. (Wat. Code, §§ 13140, 13200 et seq., 13240, 13301.) After enactment of the Clean Water Act, the Legislature "amended the Porter-Cologne Act to require the State Board and regional boards to issue discharge permits that ensure compliance with the Clean Water Act. (See Wat. Code, § 13370 et seq.)" (*WaterKeepers Northern California*, *supra*, 102 Cal.App.4th at p. 1452.) The Clean Water Act thus permits NPDES permits to be issued either by the EPA or an EPA-approved state. (33 U.S.C. § 1342(a)(1), (b); Wat. Code, §§ 13374, 13377.) The EPA has issued guidance documents discussing best management practices (BMP) to be included in MS4 permits. Under the Clean Water Act, the proper scope of the controls in an NPDES permit depends on the applicable state water quality standards for the affected water bodies. (See *Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1092.) Thus, the Clean Water Act

6

establishes a partnership between the EPA and the various states through the NPDES permit system for addressing pollution problems. The Clean Water Act envisions the use of both state and federal law to remedy pollution problems. (*International Paper Co. v. Ouellette* (1986) 479 U.S. 481, 490 [107 S.Ct. 805, 93 L.Ed.2d 883].)

Regional boards are authorized to issue NPDES permits for five-year periods. (33 U.S.C. § 1342(b)(1)(B); Wat. Code, § 13378; *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1381.) Thus, in California, wastewater discharge requirements established by the regional boards also serve as the NPDES permits required by federal law. (Wat. Code, § 13374; *City of Burbank*, *supra*, 35 Cal.4th at p. 621; *Building Industry*, *supra*, 124 Cal.App.4th at p. 875.) The state issuing a permit must insure it complies with federal requirements and provide for continued monitoring and inspection. (33 U.S.C. §§ 1342(b)(1), (b)(2), 1311, 1312, 1316, 1317.) When a permit is renewed, modified, or reissued, it must be at least as stringent as the prior permit. (33 U.S.C. § 1342(o).)

The EPA retains veto power over a state-issued NPDES permit if the EPA does not find compliance with any applicable federal requirements. (33 U.S.C. § 1342(d); 40 C.F.R. § 123.44.) Further, the EPA may withdraw its approval of a state NPDES program if it determines the state is not administering the program in compliance with the federal requirement. (33 U.S.C. § 1342(c)(3); 40 C.F.R. §§ 123.63, 123.64.) If a state repeatedly issues permits that are vetoed by the EPA, the EPA may find this constitutes grounds for withdrawal of the state's program approval. (40 C.F.R. § 123.63(a)(2)(ii).)

### B. The Commission on State Mandates

The California Constitution, article XIII B, section 6(a), provides, in relevant part: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention[4] of funds to reimburse that local government for the costs of such program or increased level of service . . . ." (See

---

**4** "'Subvention' generally means a grant of financial aid or assistance, or a subsidy. [Citation.]" (*Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564, 1577 (*Hayes*).)

also Gov. Code, § 17514.)  The purpose of this provision "is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose.  [Citations.]"  (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81.)

After the adoption of article XIII B by the voters in November 1979, the Legislature enacted a statutory and administrative scheme for implementing article XIII B, section 6, and resolving claims and disputes arising out of its provisions.  (Gov. Code, § 17500 et seq.; *Kinlaw v. State of California* (1991) 54 Cal.3d 326, 331–333.)  In 1984, the Legislature created the Commission as a quasi-judicial body to carry out a comprehensive administrative procedure to resolve disputes over the existence of state-mandated local programs.  (Gov. Code, § 17500; *California School Boards Assn. v. State* (2009) 171 Cal.App.4th 1183, 1199–1200.)  The Commission process uses a "test claim," which must be filed within one year of the effective date of the mandate or incursion of costs.  (Gov. Code, § 17551, subd. (c); *Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 877.)  The Commission acts on the test claim at a public hearing where evidence may be presented.  (Gov. Code, § 17553.)

In order to qualify for subvention, the required activity or task must constitute a new program or higher level of service.  (*San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859, 874.)  The courts have defined a "program" subject to article XIII B, section 6, of the California Constitution, as one that carries out the governmental function of providing public services, or a law that imposes unique requirements on local agencies or school districts to implement a state policy, but does not apply generally to all residents and entities in the state.  (*San Diego Unified School Dist.*, at p. 874.)  To determine if the program is new or imposes a higher level of service, the test claim legislation must be compared with the legal requirements in effect immediately before the enactment of the test claim legislation.  A "higher level of service" occurs when the new "requirements were intended to provide an enhanced service to the public."  (*Ibid.*)  Finally, the newly required

8

activity or increased level of service must impose costs mandated by the state. (*County of Fresno v. State of California* (1991) 53 Cal.3d 482, 487.)

The subvention requirement does not extend to federally mandated programs. (Cal. Const., art. XIII B, § 9, subd. (b); Gov. Code, §§ 17513, 17556, subd. (c); *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 57–58 (*City of Sacramento*).) Further, even if the program requires a higher level of service, if the local agency has the authority to levy charges, fees, or assessments sufficient to pay for the program, it will not constitute a mandate within the meaning of article XIII B. (Gov. Code, § 17556, subd. (d).)

The Commission has the sole and exclusive authority to adjudicate whether a state mandate exists. (*Redevelopment Agency v. Commission on State Mandates* (1996) 43 Cal.App.4th 1188, 1192–1193.) The Commission's authority is limited only by judicial review. "A claimant or the state may commence a proceeding in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure to set aside a decision of the commission on the ground that the commission's decision is not supported by substantial evidence. . . ." (Gov. Code, § 17559, subd. (b).)

### C. The Permit

#### 1. Background

To obtain the permit, the County of Los Angeles, on behalf of itself and the cities, submitted on January 31, 2001 a Report of Waste Discharge (ROWD), which constituted a permit application, and a Stormwater Quality Management Program, which constituted the permittees proposal for best management practices that would be required in the permit. The ROWD contained a Storm Water Management Program as set forth in 40 Code of Federal Regulations, part 122.26(d), which in turn included a Storm Water Quality Management Program (SQMP).

The Regional Board issued notices to the permitees and interested agencies and persons of its intent to issue the Permit, and provided an opportunity for comment and recommendations. In addition, the Regional Board conducted public workshops to discuss

9

drafts of the Permit, and held a public hearing at which it heard and considered all comments pertaining to the Permit's requirements.

The Permit was issued pursuant to section 402 of the Clean Water Act (33 U.S.C. § 1342), and was originally adopted by the Regional Board on December 13, 2001 as NPDES Permit No. CAS004001, and amended on September 14, 2006 and August 9, 2007.[5] The Permit established waste discharge requirements for municipal storm water and urban runoff discharges within the County of Los Angeles and the incorporated cities therein, except the City of Long Beach.

The 72-page permit is divided into six parts. The County, the flood control district, and the 84 cities are designated in the permit as the permittees. The Permit incorporated the Regional Board's factual findings regarding the nature of the harms occurring because of storm water discharge, surface water runoff, and pollutants. The Permit found "[t]he regulations require that permittees establish priorities and procedures for inspection of industrial facilities and priority commercial establishments. This permit, consistent with [EPA] policy, incorporates a cooperative partnership, including the specification of minimum expectations, between the Regional Board and the permittees for the inspection of industrial facilities and priority commercial establishments to control pollutants in storm water discharges (58 Fed. Reg. 61157)." Further, "Section 402 of the [Clean Water Act] (33 U.S.C. § 1342(p)) provides that MS4 permits must 'require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and systems, design engineering methods and such other provisions as the [EPA] Administrator or the State determines appropriate for the control of such pollutants.' The State Water Resources Control Board's (State Board) Office of Chief Counsel (OCC) has issued a memorandum interpreting the meaning of MEP to include technical feasibility, cost, and benefit derived with the burden being on the municipality to demonstrate compliance with

---

[5] The Permit was originally issued in 1990 and renewed in 1996.

10

MEP by showing that a BMP [best management practice] is not technically feasible in the locality or that BMP[] costs would exceed any benefit to be derived. . . ."

Separately, to facilitate compliance with federal regulations, the State Board has previously issued two statewide general NPDES permits for stormwater discharges: (1) for stormwater from industrial sites [NPDES No. CAS000001, General Industrial Activity Storm Water Permit (GIASP)] and (2) for stormwater from construction sites [NPDES No. CAS000002, General Construction Activity Storm Water Permit (GCASP)], originally issued in 1997 and 1999, respectively. Facilities discharging stormwater associated with industrial activities and construction sites of five acres or more of disturbed area were required to obtain individualized NPDES permits, or to be covered by a statewide general permit. The Permit sets forth that "[t]he USEPA guidance anticipates coordination of the state-administered programs for industrial and construction activities with the local agency program to reduce pollutants in storm water discharges to the MS4."

The GCASP was issued to address effluent limitations promulgated under the Clean Water Act and as specified in the applicable federal regulations. Under the GCASP, the state requires inspections of construction sites prior to anticipated storm events to identify areas contributing to the discharge of stormwater, and to ensure that BMPs were properly installed and functioned adequately during the storm. In addition, the site must permit the Regional Board, the State Board, the EPA, and the operator of the storm sewer into which the site discharges stormwater to inspect the site. The GIASP was likewise issued to address effluent limitations promulgated under the Clean Water Act and as specified in the federal regulations applicable to the Clean Water Act. With respect to inspections, the GIASP has an extensive monitoring program that is facility-specific and requires visual inspections and water sampling and analysis. Under the GIASP, the facility operator may, if it meets certain conditions, certify compliance with the GIASP and reduce the number of sampling events. Preventative maintenance must also be conducted by the facility's operators, and includes inspection of structural storm water controls (catch basins, oil/water separators, etc.) as well as other facility equipment and systems. In addition, there must be an inspection schedule of all

11

potential pollutant sources. The site must also permit Regional Board, State Board, EPA and any local storm water agency to enter into the site for inspections. The GIASP specifically notes that it "does not preempt or supersede the authority of local agencies to prohibit, restrict, or control storm water discharges and authorized non-storm water discharges to storm drain systems or other water-courses within their jurisdictions as allowed by State and Federal law." The Regional Board has the authority to enforce the GIASP and GCASP.

The Los Angeles County Flood Control District was designated as the principal permittee and was to, among other things, coordinate permit activities among the permittees and provide technical and administrative support.

### 2.     *Permit Requirements*

The County challenged before the Commission parts 4C2a (inspections of commercial facilities), 4C2b (inspection of industrial facilities), 4E (inspection of construction sites) and 4F5c3 (installation of trash receptacles) of the Permit.

### A.     Commercial Facilities.  (Part 4C2a)

Restaurants, automotive service facilities, retail gasoline stores and automotive dealerships were to be inspected by the permittees twice during the five-year term of the Permit, with a minimum of one year between inspections.

With respect to restaurants, the Permit required each permittee to inspect all restaurants within its jurisdiction to confirm that stormwater BMP's were being effectively implemented, and included verification that the restaurant operator:  "has received educational materials on stormwater pollution prevention practices;  [¶]  []does not pour oil and grease or oil and grease residue onto a parking lot, street or adjacent catch basin;  [¶]  [] keeps the trash bin area clean and trash bin lids closed, and does not fill trash bins with washout water or any other liquid; [¶]  [] does not allow illicit discharges, such as discharge of washwater from floormats, floors, porches, parking lots, alleys, sidewalks and street areas (in the immediate vicinity of the establishment), filters or garbage/trash containers;  [¶]  [] removes food waste, rubbish or other materials from parking lot areas in a sanitary manner that does not create a nuisance or discharge to the storm drain."

12

With respect to automotive service facilities, the Permit required that each permittee "inspect all automotive service facilities within its jurisdiction to confirm that stormwater BMPs are effectively implemented."  At each automotive service facility, inspectors were to verify that each operator:  "maintains the facility area so that it is clean and dry without evidence of excessive staining;  [¶]  [] implements housekeeping BMPs to prevent spills and leaks;  [¶]  [] properly discharges wastewaters to a sanitary sewer and/or contains wastewaters for transfer to a legal point of disposal;  [¶]  [] is aware of the prohibition on discharge of non-stormwater to the storm drain;  [¶]  [] properly manages raw and waste materials including proper disposal of hazardous waste;  [¶]  [] protects outdoor work and storage areas to prevent contact of pollutants with rainfall and runoff;  [¶]  [] labels, inspects, and routinely cleans storm drain inlets that are located on the facility's property; and  [¶]  [] trains employees to implement stormwater pollution prevention practices."

With respect to retail gasoline outlets and automotive dealerships, the Permit required each permittee to confirm that BMP's were being effectively implemented at each retail gasoline outlet and automotive dealership within its jurisdiction.  The permittee was to verify that each operator: "routinely sweeps fuel-dispensing areas for removal of litter and debris, and keeps rags and absorbents ready for use in case of leaks and spills;  [¶]  [] was aware that washdown of facility area to the storm drain is prohibited;  [¶]  [] [was] aware of design flaws (such as grading that does not prevent run-on, or inadequate roof covers and berms), and that equivalent BMP's are implemented;  [¶]  [] inspects and cleans storm drain inlets and catch basins within each facility's boundaries no later than October 1st of each year;  [¶]  [] posts signs close to fuel dispensers, which warn vehicle owners/operators against 'topping off' of vehicle fuel tanks and installation of automatic shutoff fuel dispensing nozzles;  [¶]  [] routinely checks outdoor waste receptacle and air/water supply areas, cleans leaks and drips, and ensures that only watertight waste receptacles are used and that lids are closed; and  [¶]  [] trains employees to properly manage hazardous materials and wastes as well as to implement other stormwater pollution prevention practices."

13

### B.  Industrial Facilities.  (Part 4C2b)

Generally, the Permit required inspections twice during the five-year term of the Permit, with more than one year between inspections.  Each permittee was required to confirm that each operator had "a current Waste Discharge Identification (WDID) number for facilities discharging stormwater associated with industrial activity, and that a Storm Water Pollution Prevention Plan is available on-site," and the facility was effectively implementing the plan.

### C.  Construction Facilities.  (Part 4E)

The Permit required each permittee to implement a program to control runoff from construction activity:  "Sediments generated on the construction site were to be retained using adequate Treatment Control and Structural BMP's"; construction related materials, spills, and residues were to be contained at the construction site to avoid runoff to streets; nonstormwater runoff from equipment and vehicle washing was to be retained at the site; erosion from slopes and channels was to be controlled by implementing BMP's, such as limiting grading during the wet season, inspecting graded areas during rain, planting and maintenance of slopes, and covering erosion susceptible slopes.  For sites one acre or larger, each was to be inspected a minimum of once during the wet season.

### D.  Trash Receptacles.  (Part 4F5c3)

The trash receptacle requirement at Part 4, Special Provisions, F. Public Agency Activities Program, 5. Storm Drain Operation and Management, c (Part 4F5c3) required trash receptacles to be placed at all transit stops within the permittee's jurisdiction.  "Permittees not subject to a trash TMDL[6] shall:  [¶]…[¶]  (3) Place trash receptacles at all transit stops within its jurisdiction that have shelters no later than August 1, 2002, and at all transit stops within its jurisdiction no later than February 3, 2003.  All trash receptacles shall be maintained as necessary."

---

**6** Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of a pollutant that a waterbody can receive and still safely meet water quality standards.

### D. Proceedings Before the Commission

#### 1. *The Hearing*

In September 2003, the County of Los Angeles and several cities within the county filed a test claim.[7]  The County sought reimbursement for the inspection requirement of commercial facilities, industrial facilities, and commercial facilities, and the trash receptacle requirement at parts 4C2a, 4C2b, 4E, and 4F5c3 of the Permit.  The Commission initially refused jurisdiction over the permit based on Government Code section 17516's definition of "executive order" that excluded permits issued by the State Board or a regional board.  In *County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, Division Three of this court held that exclusions of these entities from the definition of an executive order was unconstitutional.  The court issued a writ directing the Commission to hear the claim on the merits.  (*Id*. at p. 921.)  The county and the cities refiled the test claim in October and November 2007.

The County asserted that it did not have fee authority to collect trash from trash receptacles that must be placed at transit stops.  Further, the County asserted it had no authority to collect fees to conduct the inspections, and before the state delegated such inspections, the state had performed them.  At the hearing on the test claim held July 31, 2009, the County presented evidence consisting of:

(1) Several EPA permits for MS4 showed that many of the permits did not contain a trash receptacle requirement;

(2) The trash receptacle obligation was new and had not been included in prior permits issued by the Regional Board that were approved by the EPA;

---

[7] Originally, test claims 03-TC-04 (*Transit Trash Receptacles*) and 03-TC-19 (*Inspection of Industrial/Commercial Facilities*) were filed by the County of Los Angeles in September 2003. Test claim 03-TC-21 (*Stormwater Pollution Requirements*) was filed by the Cities of Baldwin Park, Bellflower, Cerritos, Covina, Downey, Monterey Park, Pico Rivera, Signal Hill, South Pasadena, and West Covina on September 30, 2003.  Test claim 03-TC-20 (*Waste Discharge Requirements*) was filed by Cities of Artesia, Beverly Hills, Carson, La Mirada, Monrovia, Norwalk, Rancho Palos Verdes, San Marino, and Westlake Village on September 30, 2003.

(3) Letters dated April and July 2001 from the EPA assertedly stating that the State of California had the obligation to inspect facilities for state-issued permits;[8]

(4) Evidence that the Regional Board had previously negotiated with the county to pay the county to perform inspections of industrial facilities on the Regional Board's behalf—before the Regional Board imposed that requirement on the county and cities without payment.

The Department of Finance asserted that the Permit did not impose a reimbursable mandate because the Permit conditions imposed on the local agencies were required under the NPDES program and were enforceable under the federal Clean Water Act. The Department of Finance also argued that the claimants had discretion over the activities and conditions included in the Permit and thus any resulting costs were "downstream" of the permittee's decision to include the provision and hence not state-mandated.

The County responded that whether or not an agency places trash receptacles at transit stops was not relevant to the mandate determination because if a local agency has been incurring costs that are later mandated by the state, such costs are reimbursable as a mandate. Further, the inspection duties were imposed for state-permitted industrial and commercial facilities and construction sites, and the state had been responsible for such inspections since 1969 under the Porter-Cologne Act; and the inspections were not required under the Clean Water Act.

### 2. *The Commission's Conclusions*

#### (a) *Not Discretionary*

The Commission found that because the permittees were required by state and federal law to obtain the Permit, it was not discretionary.

#### (b) *Not a Federal Mandate*

The Commission observed that "[w]hen federal law imposes a mandate on the state, however, and the state 'freely [chooses] to impose the costs upon the local agency as a means

---

[8] The letters state that the local government and the state have a tandem duty to insure inspection requirements are fulfilled.

16

of implementing a federal program, then the costs are the result of a reimbursable state mandate regardless whether the costs were imposed upon the state by the federal government,'" citing *Hayes*, *supra*, 11 Cal.App.4th at page 1593 and Government Code section 17556, subdivision (c).[9] Further, the Commission found the state could enforce its own water quality laws as long as such laws were as stringent as the Clean Water Act. (33 U.S.C. § 1342(p)(3)(B)(iii).)

(i) Trash Receptacles

The Commission found the trash receptacle obligation was not a federal mandate because federal law contained no such requirement, nor did federal law require inspections of restaurants, automotive facilities, or retail gasoline outlets. The Commission observed that nothing in the Clean Water Act indicated that California was required to have a NPDES program or issue stormwater permits; the EPA would require permits if California had no such program. Further, the plain language of the federal regulation at 40 Code of Federal Regulations, part 122.26(d)(2)(iv)(A)(3) was generally worded to require "[a] description of practices for operating and maintaining public streets, roads and highways and procedures for reducing the impact on receiving waters of discharges from municipal storm sewer systems, including pollutants discharged as a result of deicing activities" and this language did not require the permittees to install and maintain trash receptacles at transit stops. The Commission relied on *Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155 (*Long Beach Unified*) for the proposition that NPDES permits may contain a state mandate even though they are formulated to comply with federal law. In *Long Beach Unified*, Division Five of this court held that although the school district was under a federal constitutional obligation to desegregate schools, the state executive order promulgating regulations providing desegregation guidelines to schools was a state mandate because it

---

[9] Government Code section 17556, subdivision (c), states that the Commission shall not find costs mandated by the state if "[t]he statute or executive order imposes a requirement that is mandated by a federal law or regulation and results in costs mandated by the federal government, unless the statute or executive order mandates costs that exceed the mandate in that federal law or regulation."

17

required specific actions to be taken that went beyond the federal constitutional obligation as set forth in case law. (*Long Beach Unified*, at p. 173.) The Commission found that as in *Long Beach Unified*, the Permit's mandates went beyond federal requirements and thus constituted a state mandate.

(ii) Inspection Requirement.

With respect to the inspection obligations of commercial, industrial and construction facilities, the Commission analyzed the requirements of 40 Code of Federal Regulations, part 122.26(d)(2)(iv)(B) and (C). Those sections generally required the "description of a program, including inspections, to implement and enforce an ordinance, orders or similar means to prevent illicit discharges to the municipal separate storm sewer system," (40 C.F.R. § 122.26(d)(2)(iv)(B)(1)), or a requirement that permittees "[i]dentify priorities and procedures for inspections and establishing and implementing control measures for such discharges." (40 C.F.R. § 122.26(d)(2)(iv)(C)(1)). However, the federal regulations contained no express requirement to inspect restaurants, automotive service facilities, retail gasoline stations, automobile dealerships, or construction and industrial sites. Thus, this requirement was not a federal mandate.

The Commission also found that this same language in 40 Code of Federal Regulations, part 122.26(d)(2)(iv)(B)(1) and (C)(1) did not prevent the state, rather than local agencies, from inspecting industrial facilities. The statewide GIASP was administered by the State Board, and the State Board collected fees for the regional boards for performing obligations under the GIASP pursuant to Water Code section 13260, subd. (d)(2)(B)(ii). The Commission found that "[i]nasmuch as the federal regulation (40 C.F.R. § 122.26(c)) authorizes coverage under a statewide general permit for the inspections of industrial activities, and the federal regulation (40 C.F.R. § 122.26(d)(2)(iv)(D)) does not expressly require those inspections to be performed by the county or cities (or the 'owner or operator of the discharge'), . . . the state has freely chosen to impose these activities on the permittees" and no federal mandate existed. (Fn. omitted.)

18

(c)     "New Program" or "Higher Level of Service"

With respect to whether the Permit requirements "imposed a new program or a higher level of service," the Commission observed that to determine whether the permit is a new program or higher level of service, it needed to compare the Permit to the legal requirements in effect immediately before its adoption. In that regard, the Commission found that local agencies were not required by state or federal law to place and maintain trash receptacles at transit stops before the permit was adopted, as a result, it was a new program or higher level of service to place trash receptacles at transit stops and maintain them as specified in the permit.

For the same reason, the Commission found that the inspections and enforcement duties at industrial and commercial facilities, including restaurants, automotive service facilities, retail gasoline outlets, and automotive dealerships, was a new program or higher level of service because these were not required activities of the permittees prior to the permit's adoption.

E.     Proceedings Before the Trial Court

1.     Petition and Cross-Petition

On February 17, 2011, the Department of Finance, the State Board, and the Regional Board filed a petition for administrative mandamus pursuant to Code of Civil Procedure section 1094.5 against the Commission, with the County of Los Angeles and the cities of Artesia, Azusa, Bellflower, Beverly Hills, Carson, Commerce, Covina, Downey, Monterey Park, Norwalk, Rancho Palos Verdes, Signal Hill, Vernon, and Westlake Village as real parties in interest.

The Department of Finance argued that that the Permit was a federal mandate and not subject to subvention because California's administration of the mandate did not transform the Clean Water Act requirements into a state mandate. Under *City of Sacramento*, *supra*, 50 Cal.3d at pages 73–74, "certain regulatory standards imposed by the federal government under 'cooperative federalism' schemes are coercive on the states and localities in every practical sense"; similarly here, the NDPES program was coercive on the state and local

19

governments because regardless of whether the state or the EPA issued the Permit, it was not voluntary because the County had to comply with the maximum extent practicable standards and thus the Permit did not constitute a shifting of state costs to localities. Congress established the maximum extent practicable standard because municipal storm water runoff, unlike other pollutant discharges, could not be adequately addressed by blanket effluent limitations. Thus, the Commission erred in ignoring this standard and by looking solely to federal statutes and regulations to define the scope of federal law. Finally, the Department of Finance argued the Regional Board's findings regarding what was necessary to implement the maximum extent practicable standard had previously been litigated in *County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985 and previously upheld by Division Five.

The County argued that it did not have fee authority to pay for the trash receptacles or the inspections, and the State Board's fee for inspections of industrial and construction facilities preempted any fee the County might charge. The cities of Bellflower, Carson, Commerce, Covina, Downey and Signal Hill argued that the Commission properly applied the maximum extent practicable standard; whether the activities constituted a state mandate was within the Commission's purview, not the Regional Board's, and the Commission's decision was supported by substantial evidence. With respect to industrial facilities, the State Board already administered such facilities through the state-wide GIASP, which required the state to enforce its provisions; the State Board could collect fees to cover inspections of such facilities, the Regional Board entered into a contract in 2001 whereby the Regional Board paid the County to conduct inspections; and the plain language of the governing statutes and regulations do not require inspections. With respect to construction sites, the State Board already administered such facilities through the state-wide GCASP, which is enforced by the state and authorizes the State Board to collect fees for inspections; the inspection obligation was not in prior permits, and the plain language of the governing statutes and regulations do not require inspections.

In reply, the Department asserted that the maximum extent practicable standard governed whether the mandate was of federal or state origin, and there was no evidence the Permit requirements went beyond federal law. The mere fact the standard was flexible did not mean that the Permit exceeded those standards, and asserted the EPA requirements were not determinative under the Clean Water Act because under federal law, each permit must be tailored to the unique surroundings of the waterways: the language of Title 33 United States Code section 1342(p)(3)(B)(iii) contemplates that, because of the fundamentally different characteristics of many municipalities, municipalities will have permits tailored to meet particular geographical, hydrological, and climactic conditions. (55 Fed. Reg. 47990, 48053 (Nov. 16, 1990).) Further, the fact prior permits did not have the requirements of the most recent permit was not relevant because a new permit must be at least as stringent as the prior one (33 U.S.C. § 1342(o); 40 C.F.R. § 122.44(l)), and the EPA anticipates that stormwater management will evolve over time.

The County of Los Angeles and the cities of Bellflower, Carson, Commerce, Covina, Downey and Signal Hill filed a cross-petition[10] for writ of administrative mandamus, challenging the Commission's finding that although the inspection requirements of parts 4C2a, 4C2b, and 4E were state mandates, the County had the authority to levy fees pursuant to Government Code section 17556, subdivision (d) to pay for such programs and was thus not entitled to subvention.

### 2.      *Trial Court's Statement of Decision*

On August 15, 2011, the trial court issued its statement of decision in which it found the trash receptacle requirement was a federal mandate. The trial court rejected the Commission's conclusion that the state freely chose to implement the NPDES permit as legally incorrect because the fact that California was not required to issue permits and voluntarily did so did not lead to the conclusion the NPDES program was optional and thus mandated by the state. The trial court rejected the argument that there needed to be a federal

---

[10] The petition and cross-petition were initially filed in Sacramento County, but were transferred to Los Angeles County.

21

regulation particularly on point for the activity to be mandated because such an argument ignored and misplaced the flexibility built into the federal maximum extent practicable standard. Thus, the trial court found the Commission erred in isolating specific requirements to conclude that the Permit was a state mandate because one permit provision could not exceed the maximum extent practicable standard where the Regional Board had concluded the permit as a whole did not. The failure to include these provisions in prior permits did not convert the requirements into state mandates due to the evolving nature of the Clean Water Act's requirements. Further, the inspection requirements were likewise pursuant to the maximum extent practicable standard of the Clean Water Act and hence federal mandates. "A federal mandate does not require explicit mention of every mandated activity. Rather, the relevant inquiry is whether these inspection activities fall within the Clean Water Act's maximum extent practicable standard. As there is nothing in the record to suggest that they exceed this standard, the Commission's conclusions to the contrary must fail." The trial court did not address the County's cross-petition, but noted that it would fail for the same reasons as the petition.[11]

The court entered judgment granting the petition, and remanded the matter to the Commission to set aside and vacate its decision.

## DISCUSSION

### I.      Standard of Review

In reviewing the Commission's decision under Code of Civil Procedure section 1094.5, the trial court determines whether the agency proceeded in excess of jurisdiction, there was a fair hearing, and there was any prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) Abuse of discretion is established if the Commission has not proceeded in the manner required by law, the order or decision is not supported by the findings, or its findings are not supported by substantial evidence. (*Voices of the Wetlands v. State Water*

---

[11] The County does not challenge the denial of the cross-petition in this appeal.

22

*Resources Control Bd.* (2011) 52 Cal.4th 499, 516; *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810.)

We presume the Commission's findings and actions are supported by substantial evidence. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335–336; *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921–922.) We resolve all conflicts in the evidence and draw all legitimate and reasonable inferences in favor of the decision made by the trial court. Where the evidence supports multiple inferences, we may not substitute our deductions for those made by the trial court. The trial court's factual findings only may be disturbed if the evidence, as a matter of law, is insufficient to support them. (*Arthur v. Department of Motor Vehicles* (2010) 184 Cal.App.4th 1199, 1205.)

The trial court's conclusions and disposition of the issues are not conclusive, and we and the trial court "must determine whether the record is free from legal error." (*Alberstone v. California Coastal Com.* (2008) 169 Cal.App.4th 859, 863.) We examine the interpretation of legal matters utilizing a de novo standard of review. (*County of Los Angeles v. State Water Resources Control Bd.*, *supra*, 143 Cal.App.4th at p. 997.)

## II. Federal Mandates and "Maximum Extent Practicable"

The County contends that the trial court erred in finding that the Permit obligations were federal mandates because (1) the court in *County of Los Angeles v. Commission on State Mandates*, *supra*, 150 Cal.App.4th 898, previously determined the mandate issue; (2) the trial court erred in finding that the Commission failed to consider the maximum extent practicable standard; and (3) the Commission's decision is supported by substantial evidence.

Specifically, the County argues that the trial court failed to analyze whether the Regional Board specifically included certain activities not required by the federal regulations, and erred in failing to do so because the relevant federal regulations do not require inspections. The County asserts that in *Long Beach Unified*, *supra*, 225 Cal.App.3d 155, the court held that a state mandate may arise if the state, in implementing a federal requirement, requires specific actions and imposes additional burdens on a local agency beyond the federal requirements. (*Id.* at pp. 172–173.) As a result, the County contends, the Permit's inspection

23

obligations exceeded the scope of the federal regulations, both in number and required content of the inspections as well as the type of facilities to be inspected. (See, e.g., 40 C.F.R. 122.26(d)(2)(iv)(B), (C) & (D).) Further, in *Hayes*, the court held that even where federal law imposes a mandate, if the state freely chooses to shift responsibility for compliance from itself to a local agency, the resulting costs are a state mandate regardless of whether the costs were imposed upon the state by the federal government. (*Hayes*, *supra*, 11 Cal.App.4th at pp. 1593–1594.) However, the County contends, the trial court failed to apply this analysis, and if it had, it would have found that the Regional Board had a choice whether to impose the inspection obligations. First, under the Porter-Cologne Act, the Regional Board had the authority to regulate the discharge of pollutants into waterways. (See, e.g., Wat. Code, §§ 13050, subds. (d), (e), 13260, 13263.) In addition, the Porter-Cologne Act authorizes the Regional Board to require any person to furnish technical and monitoring reports describing discharges into waterways. (See Wat. Code, § 13267, subds. (b), (c).) The Porter-Cologne Act does not exempt commercial, industrial, or construction facilities from its reach. Finally, the Regional Board had the obligation to enforce the GIASP and GCASP pertaining to construction and industrial sites, which contain provisions for inspections. Under both GIASP and GCASP, the state can impose inspection fees. (See, e.g., Wat. Code, § 13260, subd. (d)(1)(A).)

The Department of Finance contends that the trial court correctly found that reliance on *Long Beach Unified*, *supra*, 225 Cal.App.3d 155 was misplaced because in that case, a state mandate was found because there was no federal law specifying how desegregation of schools should take place. (*Id*. at p. 173.) In contrast, applicable to the Permit is the Clean Water Act specifying the maximum extent practicable standard, and the Commission was required to analyze the federal maximum extent practicable standard, which it did not. In addition, the Department of Finance argues that the Regional Board's duty to inspect facilities does not substitute for the County's' obligations under an NPDES permit, and the state's inspection obligations under GIASP and GCASP impose independent duties to perform compliance inspections.

24

### A. Holding of County of Los Angeles v. Commission on State Mandates

The County contends that in *County of Los Angeles v. Commission on State Mandates*, *supra*, 150 Cal.App.4th 898, the first time this court addressed this case, the Regional Board argued that the trash receptacle and inspection obligations were federal mandates as a matter of law, contending that "the federal mandate nature of its NPDES permits remains constant although it exercises discretion to control the discharge of pollutants through municipal stormwater programs not appearing in federal regulations." (*Id.* at p. 914.) However, the County contends the court in *County of Los Angeles v. Commission on State Mandates* rejected these arguments, finding that because an NPDES permit could contain both federal and state requirements, whether the requirements constituted state or federal mandates was a fact question which must be addressed by the Commission. (*Id.* at pp. 917–918.) As a result of this holding, the County contends that this court has already rejected the federal mandate argument as a matter of law. The Department of Finance argues that the Commission should have deferred to both the Regional Board's findings in designing the Permit and the prior judicial review of those findings. (See *County of Los Angeles v. State Water Resources Control Bd.*, *supra*, 143 Cal.App.4th at p. 997.) The Commission, while an expert in mandate, is not an expert in water quality law.

We disagree. First, *County of Los Angeles v. Commission on State Mandates*, *supra*, 150 Cal.App.4th 898 did not address the issue of state mandates. The County and certain cities filed a test claim challenging the Permit. The Commission returned the claims unadjudicated because they did not involve an executive order subject to subvention under Government Code section 17516, subdivision (c). (*Commission on State Mandates*, at pp. 903–904.) On appeal, the court addressed whether section 17516, subdivision (c) was unconstitutional because it expressly exempted the Regional Board from the constitutional state mandate subvention requirement. (*Commission on State Mandates*, at p. 904.) After concluding that the statute was unconstitutional (*id.* at pp. 919–920), the court of appeal found the trial court properly issued a writ of mandate directing the Commission to review the test claims. (*Id.* at p. 921.) As the court did not address the issue of mandates, or make any

25

findings regarding the Permit, *County of Los Angeles v. Commission on State Mandates* is not binding on this court.  (See *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797.)

## B.    *The Maximum Extent Practicable Standard*

The County argues that trial court erred in finding that the Commission failed to consider the maximum extent practicable standard in making its ruling.[12]  The County asserts the federal regulations are quite specific; with respect to others, the regulations are more flexible and leave the design of the permit to the permittees.  Thus, according to the County, the general language of the regulations permits flexibility in designing programs; however, when the Regional Board demands a specific activity, it removes that flexibility and creates a mandate.  Similarly, amicus CSQA asserts that the federal regulations at issue are flexible and permit the local agencies to identify and propose the components of the program that they believe are appropriate for meeting the maximum extent practicable standard.  Here, the 2001 Permit removed such flexibility because it included new specific terms and conditions not found in the prior permits, similar to the situation in *Long Beach Unified.*  Amicus Building Industry asserts that the EPA's reserved veto power does not transform the Regional Board's exercise of discretion into a federal mandate.

---

[12] As a threshold concern, the County asserts that the trial court erroneously asserted that the MEP standard was a "technology-forcing requirement designed to foster innovation," citing *Chemical Manufacturer's Assn. v. NRDC* (1985) 470 U.S. 116, 155–156.  We disagree.  As explained in *Pronsolino v. Marcus* (N.D. Cal. 2000) 91 F.Supp.2d 1337, "[t]he 1972 [Clean Water] Act represented a major shift in enforcement policy—away from primary reliance on water-quality standards and toward primary reliance on specific effluent limits on all point sources, the latter being any discernible, confined and discrete conveyance such as a pipe or ditch.  [Citation]  The [Clean Water] Act established the National Pollution Discharge Elimination System ('NPDES') and required an NPDES permit for any discharge by any point source into any navigable water of the United States, interstate or intrastate.  The new strategy sought to force the best technology practicable or achievable on dischargers. . . .  Instead of solely working backwards from the water-quality standards to develop acceptable levels of effluent from point sources, the new lead strategy was to require point sources to employ state-of-the-art treatment, even if it led, as a happy circumstance, to even cleaner water than called for by the standards."  (*Id.* at p. 1341.)

The Department of Finance counters that the Commission's analysis ignored the maximum extent practicable standard entirely.  Instead, the Commission looked only to whether federal law specifically required certain individual measures to be in the Permit.  As a result, the Commission's analysis erroneously found that where the federal regulations imposed a flexible standard, any state action to implement the federal mandate is automatically converted into a state mandate.

### 1.    *Federal Mandates*

The subvention requirement of article XIII B, section 6 is triggered if "the Legislature or any state agency" mandates a new program or higher level of service.  (Cal. Const., art. XIII B, § 6.)  Subvention is inapplicable where the additional costs on local governments are imposed by a federal mandate, i.e., the federal government.  Article XIII B, section 9, subdivision (b), defines federally mandated appropriations as those "required to comply with mandates of the courts or the federal government which, without discretion, require an expenditure for additional services or which unavoidably make the provision of existing services more costly."  In 1980, after the adoption of article XIII B, the Legislature amended the statutory definition of "costs mandated by the federal government" to provide that such costs included "'costs resulting from enactment of a state law or regulation where failure to enact such law or regulation to meet specific federal program or service requirements would result in substantial monetary penalties or loss of funds to public or private persons in the state.'"  (*City of Sacramento*, *supra*, 50 Cal.3d at p. 75, italics omitted.)

As the case before us demonstrates, there is no precise rule or formula for determining whether a cost imposed on a local government or agency is a federal mandate.  "Given the variety of cooperative federal-state-local programs, we here attempt no final test for 'mandatory' versus 'optional' compliance with federal law.  A determination in each case must depend on such factors as the nature and purpose of the federal program; whether its design suggests an intent to coerce; when state and/or local participation began; the penalties, if any, assessed for withdrawal or refusal to participate or comply; and any other legal and practical consequences of nonparticipation, noncompliance, or withdrawal.  Always, the

27

courts and the Commission must respect the governing principle of article XIII B, section 9(b):  neither state nor local agencies may escape their spending limits when their participation in federal programs is truly voluntary."  (*City of Sacramento*, *supra*, 50 Cal.3d at p. 76.)

In *Hayes*, *supra*, 11 Cal.App.4th 1564, two county school superintendents sought reimbursement for costs incurred in connection with state special education programs enacted in 1977 and 1980.[13]  (*Id.* at pp. 1570–1574.)  The counties asserted that the state statutes imposed special education requirements in excess of the federal Rehabilitation Act of 1973 and the subsequent Education of the Handicapped Act.  (*Hayes*, at pp. 1574–1575.)  The Board of Control (precursor to the Commission) determined that federal statutes were discretionary, and that the state statutes imposed state-mandated costs in excess of the federal programs.  (*Id.* at p. 1576.)  *Hayes* observed that "[i]n order to gain state and local acceptance of its substantive provisions, the Education of the Handicapped Act employs a 'cooperative federalism' scheme, which has also been referred to as the 'carrot and stick' approach. [Citations.]  As an incentive Congress made substantial federal financial assistance available to states and local educational agencies that would agree to adhere to the substantive and procedural terms of the act."  (*Id.* at p. 1588.)

Finding that the Education of the Handicapped Act imposed a federal mandate under *City of Sacramento*, *Hayes* recognized that while the Education of the Handicapped Act included certain substantive and procedural requirements which must be included in a state's plan for implementation of the act, it left primary responsibility for implementation to the state.  "In short, even though the state had no real choice in deciding whether to comply with the federal act, the act did not necessarily require the state to impose all of the costs of implementation upon local school districts.  To the extent the state implemented the act by freely choosing to impose new programs or higher levels of service upon local school districts, the costs of such programs or higher levels of service are state mandated and subject to subvention."  (*Hayes*, *supra*, 11 Cal.App.4th at p. 1594.)

---

[13] Statutes 1977, chapter 1247 and Statutes 1980, chapter 797.

In *Long Beach Unified*, *supra*, 225 Cal.App.3d 155, the state issued an executive order adopting regulations providing guidelines for school districts to desegregate their schools. (*Id.* at p. 165.) The Long Beach Unified School District claimed the costs associated with the order were state mandates, even though the school district was under a federal constitutional obligation to desegregate. (*Id.* at pp. 163, 172.) In spite of this federal constitutional mandate, *Long Beach Unified* found a state mandate because the requirements of the executive order went beyond constitutional and case law requirements because while courts had suggested that certain steps and approaches may be helpful in complying with federal law, the executive order and guidelines required specific actions. "For example, school districts are to conduct mandatory biennial racial and ethnic surveys, develop a 'reasonably feasible' plan every four years to alleviate and prevent segregation, include certain specific elements in each plan, and take mandatory steps to involve the community, including public hearings which have been advertised in a specific manner." While these steps fit within the federal constitutional "reasonably feasible" standard of United States Supreme Court cases, the steps were "no longer merely being suggested as options which the local school district may wish to consider but are required acts. These requirements constitute a higher level of service." (*Id.* at p. 173.)

### 2. *The Maximum Extent Practicable Standard*

Title 33 United States Code section 1342(p)(3)(B)(iii) provides that permits for discharges from municipal storm sewers "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants."

The evolution of this section, and the concept of maximum extent practicable, were discussed at length in *Building Industry*, *supra*, 124 Cal.App.4th 866, which observed that when "Congress first enacted the Federal Water Pollution Control Act in 1948, it relied primarily on state and local enforcement efforts to remedy water pollution problems. [Citations.] However, by the early 1970's it became apparent that this reliance on local enforcement was ineffective and had resulted in the 'acceleration of environmental

29

degradation of rivers, lakes, and streams . . . . [Citations.] In response, in 1972 Congress substantially amended [the Clean Water Act] by mandating compliance with various minimum technological effluent standards established by the federal government and creating a comprehensive regulatory scheme to implement these laws. [Citation.] The objective of this law . . . was to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" (*Building Industry*, *supra*, 124 Cal.App.4th at p. 872; 33 U.S.C. § 1251(a).)

As enacted in 1972, the Clean Water Act mandated that an NPDES permit require compliance with state water quality standards and that this goal be met by setting forth a specific "effluent limitation," which is a restriction on the amount of pollutants that may be discharged at the point source. (33 U.S.C. §§ 1311, 136(11).) Shortly after the 1972 legislation, the EPA promulgated regulations exempting most municipal storm sewers from the NPDES permit requirements. However, the District of Columbia Circuit held a storm sewer is a point source and the EPA did not have the authority to exempt categories of point sources from the Clean Water Act's NPDES permit requirements. (*Natural Resources Defense Council, Inc. v. Costle* (D.C. Cir. 1977) 568 F.2d 1369, 1374–1377.) *Costle* rejected the EPA's argument that effluent-based storm sewer regulation was administratively infeasible because of the variable nature of storm water pollution and the number of affected storm sewers throughout the country. Although *Costle* acknowledged the practical problems relating to storm sewer regulation, the court found the EPA had the flexibility under the Clean Water Act to design regulations that would overcome these problems. (*Costle*, at pp. 1377–1383.)

During the next 15 years, the EPA made numerous attempts to reconcile the statutory requirement of point source regulation with the practical problem of regulating possibly millions of diverse point source discharges of storm water. Eventually, in 1987, Congress amended the Clean Water Act to add provisions that specifically concerned NPDES permit requirements for storm sewer discharges. (33 U.S.C. § 1342(p).) In these amendments, enacted as part of the Water Quality Act of 1987, Congress distinguished between industrial

30

and municipal storm water discharges. With respect to municipal storm water discharges, Congress clarified that the EPA had the authority to fashion NPDES permit requirements to meet water quality standards without specific numerical effluent limits and instead to impose "controls to reduce the discharge of pollutants to the maximum extent practicable . . . ." (33 U.S.C. § 1342(p)(3)(B)(iii); *Building Industry*, *supra*, 124 Cal.App.4th at p. 884.)

*Building Industry*, *supra*, 124 Cal.App.4th 866 observed that section 1342(p)(3)(B)(iii)'s statutory language and legislative history showed that Congress added the NPDES storm sewer requirements to strengthen the Clean Water Act by making its mandate correspond to the practical realities of municipal storm sewer regulation. "[A]lthough Congress was reacting to the physical differences between municipal storm water runoff and other pollutant discharges that made the 1972 legislation's blanket effluent limitations approach impractical and administratively burdensome, the primary point of the legislation was to address these administrative problems while giving the administrative bodies the tools to meet the fundamental goals of the Clean Water Act in the context of stormwater pollution. [Citations.] This legislative history supports that in identifying a maximum extent practicable standard Congress did not intend to substantively bar the EPA/state agency from imposing a more stringent water quality standard if the agency, based on its expertise and technical factual information and after the required administrative hearing procedure, found this standard to be a necessary and workable enforcement mechanism to achieving the goals of the Clean Water Act." (*Building Industry*, at p. 884.)

*Building Industry*, *supra*, 124 Cal.App.4th 866 concluded, "The federal maximum extent practicable standard is not defined in the Clean Water Act or applicable regulations . . . . [T]he maximum extent practicable standard is a highly flexible concept that depends on balancing numerous factors, including the particular control's technical feasibility, cost, public acceptance, regulatory compliance, and effectiveness. . . . [The] maximum extent practicable standard is a term of art, and is not a phrase that can be interpreted solely by reference to its everyday or dictionary meaning." (*Id.* at p. 889.)

31

The maximum extent practicable standard is necessarily flexible given the interplay between state and federal law and the unique issues presented by large municipal storm sewer systems. The Clean Water Act uses two water-quality-performance standards by which a discharger of water may be evaluated: "effluent limitations" and "water quality standards." (*Arkansas v. Oklahoma*, *supra*, 503 U.S. at p. 101.) An effluent limitation is "any restriction established by a State or the [EPA] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters . . . ." (33 U.S.C. § 1362(11).) An effluent limitation guideline is determined in light of "'the best practicable control technology currently available.'" (*Our Children's Earth Foundation v. U.S. E.P.A.* (9th Cir. 2008) 527 F.3d 842, 849 quoting 33 U.S.C. § 1311(b)(1)(A).)

On the other hand, water-quality standards are state-based and are used as a supplementary basis for effluent limitations, so that numerous dischargers, despite their individual compliance with technology-based limitations, can be regulated to prevent water quality from falling below acceptable levels. (*PUD No. 1 of Jefferson County*, *supra*, 511 U.S. at p. 704.) Water-quality standards are developed in a two-step process. First, the EPA, or state water authorities establish a waterway's "'[b]eneficial use.'" (Wat. Code, § 13050, subd. (f); *Natural Resources Defense Council v. U.S.E.P.A.* (4th Cir. 1993) 16 F.3d 1395, 1400.) Once the beneficial use is determined, water quality criteria that will yield the desired water conditions are formulated and implemented. (See *Natural Resources Defense Council*, at p. 1400; see also 33 U.S.C. § 1313(a), (c)(2)(A); 40 C.F.R. § 131.3(i).)

Unlike effluent limitations, which are promulgated by the EPA to achieve a certain level of pollution reduction in light of available technology, water-quality standards emanate from the state boards charged with managing their domestic water resources. (See *Arkansas v. Oklahoma*, *supra*, 503 U.S. at p. 101.) The EPA gives the states guidance in drafting water-quality standards and "state authorities periodically review water quality standards and secure the EPA's approval of any revisions in the standards." (*Ibid.*)

Finally, the maximum extent practicable standard is designed to require states to meet their Clean Water Act obligations. In *Environmental Defense Center, Inc. v. U.S.E.P.A.* (9th Cir. 2003) 344 F.3d 832 (*Environmental Defense Center*), the Ninth Circuit considered a challenge to a "Phase II" EPA rule for small municipal storm sewer systems. Among other things, the Phase II Rule allowed small municipal storm sewer systems to seek permission to discharge pollutants by submitting an individualized set of best management practices designed by each municipal storm sewer system ("stormwater management plans"), either in the form of an individual permit application or in the form of a notice of intent (NOI) to comply with a general permit. (*Id*. at p. 842.) As long as an NOI included a stormwater management plan, the EPA deemed a municipal storm sewer system to be in compliance with the relevant standards of the Clean Water Act, including the standard that municipal stormwater pollution be reduced to the "maximum extent practicable." (*Id*. at p. 855; 33 U.S.C. § 1342(p)(3)(B)(iii); 40 C.F.R. § 123.35.) The Phase II Rule did not require NPDES authorities to review the stormwater management plans themselves. The Ninth Circuit held, however, that the failure to require permitting authority review of the stormwater management plans violated the Clean Water Act. While the Ninth Circuit lauded the involvement of regulated parties in the development of individual stormwater pollution control programs, it emphasized that "programs that are designed by regulated parties must, in every instance, be subject to meaningful review by an appropriate regulating entity to ensure that each such program reduces the discharge of pollutants to the maximum extent practicable [i.e., the relevant statutory standard]." (*Environmental Defense Center*, at p. 856.) The Phase II Rule, by contrast, failed to require that the relevant permitting authorities review the stormwater management plans to "ensure that the measures that any given operator of a [small municipal storm sewer system] has decided to undertake will *in fact* reduce discharges to the maximum extent practicable." (*Id*. at p. 855.) Accordingly, *Environmental Defense Center* held the Phase II Rule provided no safeguard against a municipal storm sewer system's "misunderstanding or misrepresenting its own stormwater situation and proposing a set of minimum measures for itself that would reduce discharges by far less than the maximum

33

extent practicable." (*Ibid.*) The Ninth Circuit concluded that the EPA's failure to require review of NOI's and the EPA's failure to make NOI's available to the public or subject to public hearings contravened the express requirements of the Clean Water Act, and vacated those portions of the Phase II Rule that addressed procedural issues relating to the issuance of NOI's under the small municipal storm sewer general permit option, and remanded to the EPA to permit the EPA to take appropriate action to comply with the Clean Water Act. (*Id.* at pp. 858, 879.)

Balancing the standards of *Building Industry*, *supra*, 124 Cal.App.4th 866, we conclude the Permit's requirements for the trash receptacles and inspection of commercial, industrial, and construction sites as a matter of law constitute federal mandates. We do not disagree with the holdings of *Hayes*, *supra*, 11 Cal.App.4th 1564 and *Long Beach Unified*, *supra*, 225 Cal.App.3d 155 that as a general proposition, where a state goes beyond a federal law and imposes additional state-based requirements, a state mandate may exist to the extent federal law is exceeded. However, Title 33 United States Code section 1342(p)(3)(B)(iii) is a unique statute and imposes a broad standard in recognition of developing clean water technology; thus, general-purpose mandate analysis is of limited utility in the area of clean water law precisely because the Clean Water Act recognizes that the states function, for practical purposes, as arms of the EPA in implementing the Clean Water Act. Thus, when a state implements the federal maximum extent practicable standard in an NPDES permit, we cannot say the state is acting in the traditional governmental role of a state; rather, although the state provides the infrastructure necessary to meet clean water standards, it acts on behalf of the EPA in doing so.

The EPA's oversight and veto control of the NPDES program, and the Clean Water Act's goal of permitting each locality to fashion the appropriate measure to address pollution problems by applying evolving clean water technology, convince us that *Building Industry*, *supra*, 124 Cal.App.4th 866 guides us in evaluating, for purposes of subvention analysis, what the state may put in its NDPES permit to meet the maximum extent practicable standard and

what the federal government requires. The states and local agencies are required by their own unique waterway conditions to adopt requirements to alleviate pollution; the federal regulations recognize that the federal government has a limited role in specifying what the specific measures must be.

Administrative agency decisions come to court with a strong presumption of correctness based on Evidence Code section 664 that "official duty has been regularly performed." (*Fukuda v. City of Angels*, *supra*, 20 Cal.4th at p. 812.) "'Obviously, considerable weight should be given to the findings of experienced administrative bodies made after a full and formal hearing, especially in cases involving technical and scientific evidence.'" (*Ibid.*, quoting *Drummey v. State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 86.) Inherent in a Regional Board's determination is a recognition that the specific action requirements under the Permit have been decided to be within the "maximum extent practicable" standard of the Clean Water Act. However, this is not to say that any action requirement that *might* advance the objectives of the Clean Water Act is automatically within the maximum extent practicable standard.

In reviewing whether particular mandates fall within the maximum extent practicable standard, with respect to the trash receptacle and inspection provisions at issue, we apply *Building Industry*, *supra*, 124 Cal.App.4th 866 and balance numerous factors, including the particular requirement's technical feasibility, cost, public acceptance, regulatory compliance, and effectiveness. (*Id.* at p. 889.) Trash receptacles are a simple method of keeping stormwater clean because they prevent trash and other debris from entering storm drains and entering the ocean and local rivers and drainage canals. Inspections to insure that the commercial, industrial and construction sites likewise maintain careful practices to prevent stormwater from becoming contaminated is a first line of defense; indeed, insuring compliance in these areas places some of the burden for maintaining clean water on private parties. As a result, those provisions further the state Clean Water Act goal of reducing pollution to the maximum extent practicable and thus constitute federal mandates. However,

35

given the flexibility and mutability of the maximum extent practicable standard, of necessity our decision is limited to the specific mandates addressed here.

The County argues that the Regional Board is empowered to enforce the provisions of the state-issued GIASP and GCASP and to charge fees for inspections under Water Code section 13260, subdivision (d), and shifted this obligation to the County by including the inspection requirements in the Permit. We disagree that the Permit improperly shifted the inspection requirements of the GIASP and GCASP. The County's argument assumes (without evidentiary or logical support) that the inspection obligations in the GIASP and GCASP are purely state mandates or a combination of federal and state mandates. We disagree; the GIASP and GCASP expressly and solely provide that they are issued to comply with the Clean Water Act and EPA regulations. Thus, shifting the federally-mandated GIASP and GCASP inspection obligations via the Permit's inspections could not constitute the shifting of a *state* mandate.

### C. Substantial Evidence

The County argues that the Commission's decision that the trash receptacle obligation was not a federal mandate was supported by substantial evidence, as was its finding that the inspection obligations were not federal mandates. We have concluded that the Commission erred in the first instance in failing to consider the proper legal framework for analyzing the subvention question, the Permit's requirements are not state mandates as a matter of law, and thus do not reach the issue of whether substantial evidence supports its conclusions.[14]

---

[14] The Department of Finance contends the court addressed the mandate issue of the trash receptacles and inspection requirements in an unpublished portion of *County of Los Angeles v. State Water Resources Control Bd.*, *supra*, 143 Cal.App.4th 985. To rebut this argument and to establish that they appropriately raised the issue of unfunded state mandates, the County requests that we take judicial notice of two orders issued by the Superior Court in *County of Los Angeles v. Regional Quality Control Board for the Los Angeles Region* (2005, No. BS080758), in which the court sustained demurrers to the County's claim that the permit requirements at issue were unfunded state mandates. In those orders, the trial court held that the appropriate vehicle for challenging the permit requirements was to file a test claim with the Commission. We take judicial notice of those documents. (Evid. Code, §§ 452, 459.) We conclude the trial court did not address

## III.  Preemption

Amicus Building Association argues that we should apply federal preemption analysis to the question and determine that federal law does not preempt state law; therefore, the additional requirements, being creatures of state law and the Regional Board's exercise of its own discretion, constitute state mandates because they exceed the prior permits.  Further, Building Association argues that the federal statutes and regulations constitute a federal directive to exercise unfettered state discretion; thus, the proper question before the trial court was whether the Regional Board exceeded its state discretion when it determined the maximum extent practicable relative to the MS4 permits.  As a result, no MS4 permit would exceed the maximum extent practicable because that maximum extent practicable is whatever the Regional Board divines it to be.  The Department of Finance responds that federal preemption is not relevant where the issue to be decided is whether a federal or a state mandate exists.  Rather, the inquiry is on the scope of the requirements of federal law.

"The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935.)  "There is a presumption against federal preemption in those areas traditionally regulated by the states." (*Id*. at p. 938.)  Therefore, "'[w]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' [Citations.]" (*Ibid.*)  "There are four species of federal preemption:  express, conflict, obstacle, and field." (*Id*. at p. 935.)

---

the issue of whether the Permit's requirements were state mandates; rather, the trial court held that the Commission was the appropriate vehicle for determination of state mandates.  Further, the appellate court in *County of Los Angeles v. State Water Resources Control Bd.*, *supra*, 143 Cal.App.4th 985 did not decide the issue.  Thus, the opinion was not binding on the Commission or any other adjudicatory entity on the issue of state mandates.  (See *Boeken v. Philip Morris USA, Inc.*, *supra*, 48 Cal.4th at p. 797.)

As our discussion of the federal mandate issue demonstrates, the Permit, although issued by a state agency under enabling Water Code provisions, is a federal permit that implements federal law in the form of the maximum extent practicable standard. As a result, there is no California law that might be preempted, and federal preemption analysis is inapposite.

## IV.    Removal of Commission's Discretion; Remand

The County contends the trial court erred in reversing the Commission's decision; but even if the Commission erred in its analysis of the test claims, the trial court should have remanded the matter for further proceedings to permit the Commission to exercise its discretion properly. (Code Civ. Proc., § 1094.5, subd. (f); *National Auto. & Cas. Ins. Co. v. Downey* (1950) 98 Cal.App.2d 586, 594.) The Department of Finance contends remand is inappropriate because there is nothing for the Commission to exercise its discretion over because its decision was based upon faulty legal conclusions. As we conclude that the trial court correctly applied the maximum extent practicable standard and found the Permit's requirements did not, as a matter of law, constitute unfunded state mandates because those requirements originated in the federal maximum extent practicable standard, remand to the Commission is unnecessary.

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


MALLANO, P. J.


ROTHSCHILD, J.

## Appendix A

40 Code of Federal Regulations, part 122.26(d)(2)(iv):

"Proposed management program. A proposed management program covers the duration of the permit. It shall include a comprehensive planning process which involves public participation and where necessary intergovernmental coordination, to reduce the discharge of pollutants to the maximum extent practicable using management practices, control techniques and system, design and engineering methods, and such other provisions which are appropriate. The program shall also include a description of staff and equipment available to implement the program. Separate proposed programs may be submitted by each coapplicant. Proposed programs may impose controls on a systemwide basis, a watershed basis, a jurisdiction basis, or on individual outfalls. Proposed programs will be considered by the Director when developing permit conditions to reduce pollutants in discharges to the maximum extent practicable. Proposed management programs shall describe priorities for implementing controls. Such programs shall be based on:

"(A) A description of structural and source control measures to reduce pollutants from runoff from commercial and residential areas that are discharged from the municipal storm sewer system that are to be implemented during the life of the permit, accompanied with an estimate of the expected reduction of pollutant loads and a proposed schedule for implementing such controls. At a minimum, the description shall include:

"(1) A description of maintenance activities and a maintenance schedule for structural controls to reduce pollutants (including floatables) in discharges from municipal separate storm sewers;

"(2) A description of planning procedures including a comprehensive master plan to develop, implement and enforce controls to reduce the discharge of pollutants from municipal separate storm sewers which receive discharges from areas of new development and significant redevelopment. Such plan shall address controls to reduce pollutants in discharges from municipal separate storm sewers after construction is

completed.  Controls to reduce pollutants in discharges from municipal separate storm sewers containing construction site runoff are addressed in paragraph (d)(2)(iv)(D) of this section;

"(3) A description of practices for operating and maintaining public streets, roads and highways and procedures for reducing the impact on receiving waters of discharges from municipal storm sewer systems, including pollutants discharged as a result of deicing activities;

"(4) A description of procedures to assure that flood management projects assess the impacts on the water quality of receiving water bodies and that existing structural flood control devices have been evaluated to determine if retrofitting the device to provide additional pollutant removal from storm water is feasible;

"(5) A description of a program to monitor pollutants in runoff from operating or closed municipal landfills or other treatment, storage or disposal facilities for municipal waste, which shall identify priorities and procedures for inspections and establishing and implementing control measures for such discharges (this program can be coordinated with the program developed under paragraph (d)(2)(iv)(C) of this section); and

"(6) A description of a program to reduce to the maximum extent practicable, pollutants in discharges from municipal separate storm sewers associated with the application of pesticides, herbicides and fertilizer which will include, as appropriate, controls such as educational activities, permits, certifications and other measures for commercial applicators and distributors, and controls for application in public right-of-ways and at municipal facilities.

"(B) A description of a program, including a schedule, to detect and remove (or require the discharger to the municipal separate storm sewer to obtain a separate NPDES permit for) illicit discharges and improper disposal into the storm sewer.  The proposed program shall include:

"(1) A description of a program, including inspections, to implement and enforce an ordinance, orders or similar means to prevent illicit discharges to the municipal

2

separate storm sewer system; this program description shall address all types of illicit discharges, however the following category of non-storm water discharges or flows shall be addressed where such discharges are identified by the municipality as sources of pollutants to waters of the United States:  water line flushing, landscape irrigation, diverted stream flows, rising ground waters, uncontaminated ground water infiltration (as defined at 40 CFR 35.2005(20)) to separate storm sewers, uncontaminated pumped ground water, discharges from potable water sources, foundation drains, air conditioning condensation, irrigation water, springs, water from crawl space pumps, footing drains, lawn watering, individual residential car washing, flows from riparian habitats and wetlands, dechlorinated swimming pool discharges, and street wash water (program descriptions shall address discharges or flows from fire fighting only where such discharges or flows are identified as significant sources of pollutants to waters of the United States);

"(2) A description of procedures to conduct on-going field screening activities during the life of the permit, including areas or locations that will be evaluated by such field screens;

"(3) A description of procedures to be followed to investigate portions of the separate storm sewer system that, based on the results of the field screen, or other appropriate information, indicate a reasonable potential of containing illicit discharges or other sources of non-storm water (such procedures may include:  sampling procedures for constituents such as fecal coliform, fecal streptococcus, surfactants (MBAS), residual chlorine, fluorides and potassium; testing with fluorometric dyes; or conducting in storm sewer inspections where safety and other considerations allow.  Such description shall include the location of storm sewers that have been identified for such evaluation);

"(4) A description of procedures to prevent, contain, and respond to spills that may discharge into the municipal separate storm sewer;

"(5) A description of a program to promote, publicize, and facilitate public reporting of the presence of illicit discharges or water quality impacts associated with discharges from municipal separate storm sewers;

"(6) A description of educational activities, public information activities, and other appropriate activities to facilitate the proper management and disposal of used oil and toxic materials; and

"(7) A description of controls to limit infiltration of seepage from municipal sanitary sewers to municipal separate storm sewer systems where necessary;

"(C) A description of a program to monitor and control pollutants in storm water discharges to municipal systems from municipal landfills, hazardous waste treatment, disposal and recovery facilities, industrial facilities that are subject to section 313 of title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA), and industrial facilities that the municipal permit applicant determines are contributing a substantial pollutant loading to the municipal storm sewer system. The program shall:

"(1) Identify priorities and procedures for inspections and establishing and implementing control measures for such discharges;

"(2) Describe a monitoring program for storm water discharges associated with the industrial facilities identified in paragraph (d)(2)(iv)(C) of this section, to be implemented during the term of the permit, including the submission of quantitative data on the following constituents: Any pollutants limited in effluent guidelines subcategories, where applicable; any pollutant listed in an existing NPDES permit for a facility; oil and grease, COD, pH, BOD5, TSS, total phosphorus, total Kjeldahl nitrogen, nitrate plus nitrite nitrogen, and any information on discharges required under § 122.21(g)(7)(vi) and (vii).

"(D) A description of a program to implement and maintain structural and non-structural best management practices to reduce pollutants in storm water runoff from construction sites to the municipal storm sewer system, which shall include:

"(1) A description of procedures for site planning which incorporate consideration of potential water quality impacts;

"(2) A description of requirements for nonstructural and structural best management practices;

"(3) A description of procedures for identifying priorities for inspecting sites and enforcing control measures which consider the nature of the construction activity, topography, and the characteristics of soils and receiving water quality; and

"(4) A description of appropriate educational and training measures for construction site operators."